Thomas COX, Individually and on Behalf of his minor child, Duane Cox, Plaintiffs-Appellants,

v.

The Honorable Robert TURLEY, Individually, as a Member of the Madison County Fiscal Court and as Madison County Juvenile Judge, et al., Defendants-Appellees.

No. 73–1856.

United States Court of Appeals, Sixth Circuit.

Nov. 22, 1974.

Robert A. Sedler, Anthea M. Boarman, Lexington, Ky., for plaintiffs-appellants.

Thomas D. Shumate, Shumate, Shumate & Flaherty, Charles R. Coy, Coy & Coy, George W. Robbins, Madison County Atty., Richmond, Ky., for defendants-appellees.

Before McCREE and MILLER, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

This is an appeal from an order of the District Court dismissing plaintiff's complaint for injunctive and declaratory relief for defendants' alleged violation of plaintiff's rights under the Fourth Amendment, the Eighth Amendment, and the due process and equal protection clause of the Fourteenth Amendment of the Constitution of the United States.

The complaint was brought by Thomas Cox, on behalf of his 16-year-old son, Duane Cox, and on behalf of all other

juveniles residing within the confines of Madison County, Kentucky; the parents of all juveniles so situated; all juveniles who will be within the confines of Madison County, and the parents of all juveniles so situated. He alleged that there are *common questions of law and fact affecting the rights of plaintiff's class relating to the pattern of practice of defendants, acting individually and in concert in the placement of juveniles in the Madison County jail, with each action violating the Constitution of the United States.* He further alleged that the members of the class were so numerous as to make joinder of them impossible and impractical, and that common relief was sought against defendants' illegal acts and failure to act; and that they have, by pattern of practice, individually and in concert, acted in a manner generally applicable to the plaintiff's class and that common relief is sought by this action against defendants' illegal acts and failure to act.

The defendants were all officials concerned, by state law, with the arrest, provisions for custody, and judicial determination of rights of juveniles.

The District Court held that the plaintiff failed to carry his burden of proof that the class he represented was deprived of rights guaranteed by the Federal Constitution. However, plaintiff's counsel was given no opportunity to introduce evidence to show that plaintiff had carried such burden of proof, as the case was dismissed on motion, with no evidence being offered. The rule governing this situation has recently been announced by the United States Supreme Court in the case of Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), as follows:

"When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test. Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.

"'[I]n appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' Conley v. Gibson, 355 U. S. 41, 45 [78 S.Ct. 99, 102, 2 L.Ed. 2d 80] (1957)."

The Court also held that whether the allegations contained in the complaint setting forth a failure of some or all of the defendants to comply with state law were immaterial, such failure would not constitute a denial of due process under the Federal Constitution, citing Anderson v. Nosser, 438 F.2d 183 (C.A. 5, 1971).

This is a juvenile case. The Juvenile Court is a comparatively new institution. It is surprising so little is known about it.

"A new generation of lawyers, judges, social workers, and other professionals has come into being since the juvenile court was founded." [1]

"The stream of reform that culminated in creating the first state-wide juvenile court in Illinois on July 1, 1899, sprang from such apparently disparate headwaters as the activity of philanthropic associations on behalf of street urchins, waifs, and wayward

1. Elson, "Juvenile Courts and Due Process," 1962). The author is Chairman of the in Justice for the Child 95 (Rosenheim ed.

Board of Mental Health Commissioners of Illinois.

and misdemeanant youngsters; the growth of laws preventing cruelty to children and rescuing the dependent and neglected. * * * Most would agree with Judge Julian Mack that a crucial element was lacking prior to the passage of the Act: 'What we did not have was the conception that a child that broke the law was to be dealt with by the state as a wise parent would deal with a wayward child.' " [2]

In the case of In Re Gault, 387 U.S. 1, 14, 87 S.Ct. 1428, 1437, 18 L.Ed.2d 527, Mr. Justice Fortas, speaking for the Court said:

"The juvenile Court movement began in this country at the end of the last century. From the juvenile court statute adopted in Illinois in 1899, the system has spread to every State in the Union, the District of Columbia, and Puerto Rico. * * *

"The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals."

And, in the same case, Mr. Justice Stewart observed:

"In the last 70 years many dedicated men and women have devoted their professional lives to the enlightened task of bringing us out of the dark world of Charles Dickens in meeting our responsibilities to the child in our society." *Supra*, p. 79, 87 S.Ct. p. 1470.

In some jurisdictions where the police operate a detention home in cases where the child is unable to be turned over to his parents, police are entrusted with deciding whether or not the arrested child should be detained. Teeters and Reineman, The Challenge of Delinquency; Causation, Treatment, and Prevention of Juvenile Delinquency (New York; Prentice-Hall, 1950, p. 228.)

"Most detention homes violate the very principles of mental hygiene which were violated in the child's own home—denial of love and emotional security, lack of meaningful activity, little opportunity to make successful choices, and so forth." Sherman R. Norman, "The Detention Home," Annals of the American Academy of Political and Social Science, CCXLI (January 1949) p. 161.

"Outright cruelty is not unknown in some of the country's detention centers, to say nothing of dismal, crowded quarters and a staff calloused in spirit by overwork and inadequate facilities. In the case of children detained in such an institution, who are charged but not yet adjudicated as delinquents, the mockery is deplorable enough. It is outrageous in the case of neglected and dependent children; yet such occurrences are not infrequent." *ibid.* p. 159.

To return to the facts of the present cause, the case arises out of the following circumstances as alleged by appellant: Duane Cox, a boy 16 years old, was walking down a street in the town of Richmond in Madison County, Kentucky, on a summer evening, Saturday, August 12, 1972. He was doing nothing to attract attention and, apparently, was only visiting the town in the county in which his cousin lived, adjoining the one in which he lived with his parents. A police officer arrested the boy for violation of the curfew law, took him to the Madison County jail and lodged him there on the verbal telephoned orders of defendant, Robert Turley, a non-lawyer judge, in charge of such juvenile affairs, as is the established custom of the defendants. When the boy was taken to jail, he asked for the right to telephone his father, to tell him where he was, and of his need for help. This request of the boy was abruptly refused. The boy was then lodged with the jailer of the Madison County jail. There was no hearing of any kind before the boy was turned over to the jailer.

---

2. Rosenheim, "Perennial Problems in the Juvenile Court," in *Id.* at 1.

The police officer who arrested the boy did not notify the parents or release the boy with a written promise to appear at a specified time, as provided by the Kentucky Statutes. The boy was not taken before any judicial officer before his incarceration.

On the fifth day after the arrest and imprisonment, defendant Robert Turley, the non-lawyer judge, had the boy brought before him. There is no record of what was said, as the case comes before us only on the pleadings, briefs and Joint Appendix. All that appears is that when the boy came before the judge, he was ordered to have a hair-cut, to shave his beard, and to appear before him a week later, on August 25, 1972, to show that such action had been taken. The boy was then released to his father with a promise to return on the above-mentioned date. The order of the court was obviously unlawful and arbitrary.

After the boy had complied with this order, he was released to his father, pending juvenile court proceedings—about which nothing so far has been done.

The boy in this case was never arraigned. "To arraign is nothing else but to call the person to the bar of the court to answer the matter charged upon him in the indictment." 3 Bl.Com. 322, 323, 341. The boy was denied his federal constitutional rights by being deprived of his liberty without due process of law. He was simply arrested and taken to jail, placed in the hands of the turnkey, and then confined with the general prison population.

As to the observation that the boy was confined to a jail cell with no contact whatever with other offenders, either adult or juvenile, the record does not show the boy's confinement to a cell but rather imprisonment in an "adult jail facility." It is almost unthinkable that a boy would be locked in a cell in solitary confinement from Saturday night to Wednesday morning, incommunicado, for the offense of being out after curfew, and plaintiff makes no suggestion that such monstrous mistreatment was indulged in. If the boy was confined in "an adult jail facility," as contended by plaintiff, it may be that he was confined to a cell at night, as prisoners usually are. But prisoners in a prison or jail mingle with each other on various and numerous occasions, and it is this intermingling of juvenile and adult offenders that the law forcefully commands shall not be permitted by prison or jail authorities. Courts take judicial notice that a general prison population includes criminals of all types, young and old, dangerous, of every character. And the courts also particularly take judicial notice that it is not uncommon to find the indiscriminate mixing of hardened criminals, including sexual assaulters, with young offenders. People v. Terry Lee Harmon, 53 Mich.App. 482, 220 N.W.2d 212 (decided May 30, 1974).[3]

It is to observed that in many of the jails in this Circuit—federal as well as state—judges have forbidden the police to imprison arrested juveniles with the general prison population because of the danger to them of association with hard-

---

3. In the *Harmon* case, *supra*, Judge Brennan, speaking for the court, said: "Defendant concedes that he was lawfully committed to the Michigan reformatory at Ionia and that he escaped therefrom on June 29, 1972. Defendant contends, however, as he did in the court below, that his departure from prison was done under duress in order to avoid threatened homosexual attacks by other inmates. Although testimony supportive of such a claim was presented in the court below, the trial judge instructed the jury that, even if they did find that defendant fled to avoid homosexual attacks, such a claim would not serve as a defense to a charge of prison escape. It is defendant's contention that the trial judge erred reversibly in giving such an instruction. We agree. The time has come when we can no longer close our eyes to the growing problem of institutional gang rapes in our prison system." The Court of Appeals reversed the trial court and held that the defense should have been submitted to the jury and that if they found that the escape was because of the threatened and actual gang rapes, the defendant would be exonerated from the offense of prison escape.

ened criminals and to protect them from sexual assaults.

In the accompanying opinion, it is observed that:

"No court, to my knowledge, has ever held that confinement of a juvenile in a county jail for the comparatively brief period of five days without the benefit of recreational or educational facilities, or psychological treatment programs, or books or reading materials, constituted cruel and unusual punishment."

As I see it, this is not the point or issue on which the disposition of this case depends. In the first place, the juvenile was held, without charge or arraignment, in the county jail contrary to the state law—and the county judge and police knew he was being held in violation of the state law; and the boy was further being held in the jail in derogation of his rights under the federal constitution.

To clarify the problem, the "cruel and unusual punishment" in this case does not reside in the above-quoted language of the concurring opinion. Rather, it is the ever-present peril of dangerous assault upon both the body and mind of the boy that is one of the constituents of cruelty that comes from confining this young boy with the general prison population. It is well known that the younger the boy who is confined, the more immediate is the danger to him. All of the foregoing is well illustrated by reference to the Reader's Digest issue of November, 1973. That issue carried an account of an interview concerning child arrests that casts a baleful light on the problem before us. Donald Robinson was interviewing Milton G. Rector, President of the National Council on Crime and Delinquency. In answer to the question, "Can you teach a child a lesson by letting him stay in jail a couple of nights?", Mr. Rector answered:

"No child deserves that kind of lesson. Being in jail is a traumatizing experience for youngsters. Some are brutalized. Some hurt themselves. All are further alienated from their parents. Just recently, a case came across my desk of a 17-year old college freshman, who was arrested because police found marijuana in his dormitary room. The boy's father let the police keep him in jail overnight. When he got there in the morning, the boy's nose was broken and both his eyes blackened—the result of a fight begun when older, tougher prisoners tried to gang-rape the younger boys." What To Do If Your Child Is Arrested, Reader's Digest, Nov. 1973, pp. 167– 168.

No notice was given him or his parents of the cause of his arrest. There was no probable cause hearing. The due process clause requires that notice of the charge must be given to the accused *at the earliest practicable time and, in any event, sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and it must "set forth the alleged misconduct with particularity."* In Re Gault, 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527. It is said by counsel for appellees that there was no need to charge the boy because he knew the reason for his arrest. "It may be probable that the defendant in this case was perfectly aware of the offense with which he was charged. It appears that he consented to go to trial, but a trial of what did he consent to? He was arrested and held in custody under the process of the court. It was his right to be informed, and it was the duty of the government to inform him of the accusation against him. This is done by arraignment and requiring the defendant to plead. * * * [A] plea, an issue, is absolutely essential." Crain v. United States, 162 U.S. 625, 639, 640, 16 S.Ct. 952, 957, 40 L.Ed. 1097. "Until the defendant has pleaded to the indictment, there is no issue to be submitted to the jury, and the omission to plead is fatal to the judgment, even after verdict. This rule applies as well to cases of misdemeanor as to cases of felony." Shelp v. United States (9th Cir.) 81 F.

694, 701. "[D]ue process of law requires that the accused * * * plead, or, in a proper case, that a plea of not guilty be filed for him, before his trial can rightfully proceed." Crain v. United States, 162 U.S. 625, 645, 16 S.Ct. 952, 959, 40 L.Ed. 1097.

A boy 16 years old is not to be slighted and his rights bandied about because of his youth by a lay judge who knows nothing of the treatment to be accorded citizens, due to his lack of experience and training in the rigorous discipline of the law. There is something rather offensive to moral decency in considering the police officer telephoning the judge that he had arrested the boy, and the judge's immediate consent that the boy be forthwith locked up in the jail, without the right to call his father—all in violation of the law. It is difficult to define the relationship between the judge, the police officer, and the turnkey, as anything else but a well-understood collusion and connivance, and avoidance of the law.

A boy 16 years old is not to be slighted and ignored by a court because of his youth, and he is not to be arrested, denied the right to call his father or counsel, imprisoned without a charge placed against him, and without even being arraigned, anymore than a judge of this court is to be so treated for a trivial misdemeanor. Of course, an adult could recover his freedom by writ of habeas corpus, which right the child, *in this case,* does not, incongruously and incompatibly, have—because of the duty of the state to protect him during these tender years, in every way, protecting him against being imprisoned with the general prison population, placing him immediately in the custody of his parents until his case is called—none of which was observed in this case.

The action taken by the judge, police, and jail authorities in this case, in derogation of the constitutional rights of an American citizen, is not to be gently tolerated by this court, because of niceties of pleading.

■■ The boy was deprived of his constitutional rights under the due process clause by reason of his confinement with the general jail population without a charge lodged against him, without being arraigned, and without being taken before any judicial officer, "at the earliest practicable time" as prescribed in the case of In Re Gault, *supra,* and without being given any notice of his alleged offense. Moreover, the officer's refusal to permit the boy to make a telephone call to his parents when he was taken to jail, and the refusal of the arresting officer to notify the boy's parents, as commanded by the Kentucky statutes, together with his confinement with the general jail population without a probable cause hearing, constituted cruel and unusual punishment, in violation of the boy's rights under the Eighth Amendment to the Federal Constitution.

· The ordinary man can well contemplate the state of mind of this boy, arrested by a police officer, taken to jail, refused the right to call his parents to tell them where he was, turned over to the turnkey to be incarcerated with the jail population, in which it is not uncommon to find the indiscriminate mixing of hardened criminals, including degenerates, with young offenders—for a period of five days, with no way of communicating with relatives or friends.

With regard to the standards for determining cruel and unusual punishment, certainly one of the standards is conduct which "shocks the most fundamental instincts of civilized man." Louisiana ex rel. Francis v. Resweber, Sheriff, et al., 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422, or is a method of punishment which violates *"the evolving standards of decency that mark the progress of a maturing society."* (Emphasis supplied.) Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630. The Eighth Amendment "is not fastened to the obsolete * * *." Wright v. McMann, 387 F.2d 519, 525 (C.A.2, 1967).

What Judge Feinberg said in Sostre v. McGinnis, 442 F.2d 178, 208 (C.A.2, 1971), is here applicable:

> "What might once have been acceptable does not necessarily determine what is 'cruel and unusual' today. * * * In this Orwellian age, punishment that endangers sanity, no less than physical injury by the strap, is prohibited by the Constitution. Indeed, we have learned * * * that true inhumanity seeks to destroy the psyche rather than merely the body."

As Dean Francis A. Allen, in his admirable book, *"The Borderland of Criminal Justice,"* states on page 37:

> "There is one proposition which, if generally understood, would contribute more to clear thinking on these matters than any other. It is not a new insight. Garafalo asserted: 'The mere deprivation of liberty, however benign the administration of the place of confinement, *is undeniably punishment.'* " (Emphasis supplied.)

The worst and most illegal feature of all these proceedings is in lodging the child with the general population of the jail, without his ever seeing some official of the court.

Judge Orman W. Ketcham, Judge of the Juvenile Court of the District of Columbia, Member of the Executive Committee, Advisory Council of Judges, National Council on Crime and Delinquency, formerly with the Department of Justice, in a contribution to a brilliantly-edited symposium on the subject by Margaret K. Rosenheim, Professor of Social Service Administration, University of Chicago, *Justice for the Child,* says:

> *"Prohibition against Use of Jails.* During adolescence a child is presumed to be most impressionable. Consequently, it has long been recognized that a child's close contact with an adult can serve either a good or a bad purpose depending on the proclivities of the adult. With this in mind, the state promises that no child will be imprisoned or placed in a jail or lockup lest the state abet the downfall of a child by confining him with adult offenders. It also promises that the child will not otherwise be brought into contact with adult criminals or commingled with vicious or immoral persons."

It is astonishing that, although the trivial violation of the rule of curfew was committed by a 16-year-old boy (and it is difficult to imagine a more trivial violation), he has been subjected to all the various violations of law by the authorities. When he finally appeared before the juvenile judge, after confinement in jail with the common criminal population from Saturday evening until the following Wednesday, he was told by the judge to have his hair cut and was then released to his father. But the release to his father was merely to continue the custody of the boy, still subject to the court for trial on the violation of the curfew. That was on Wednesday, August 16, 1972, but the charge of violation of the curfew is still pending on this trivial matter—nearly twenty months after his appearance before the judge. There appears no possible reason for the court's continuing such custody. To continue and keep continuing this custody for twenty months after what the boy has gone through, seems an inexplicable injustice. Both the Fourth Amendment and the Fifth Amendment were violated because there was no prompt determination of probable cause—a constitutional mandate that protects juveniles as well as adults. Cooley v. Stone, 134 U.S.App.D.C. 317, 414 F.2d 1213 (1969). The fact that a juvenile who was arrested was not deprived of his freedom but was left in the custody of his mother did not remove him from the protection of the Fourth Amendment, and he was entitled to a hearing to determine if there was probable cause to hold him for trial. The right to be free of a seizure of one's person made without probable cause does not depend upon the character of the subsequent custody. Brown v. Fauntleroy, 143 U.S.App.D.C. 116, 442 F.2d 838 (1971).

In discussing a holding by a District Court that once a plea of guilty is accepted by a court of competent jurisdiction, jeopardy immediately attached as a result of proceedings in the Juvenile Court, the United States Court of Appeals stated:

"The District Court relied on some early state cases * * *. But those cases throw little light on the issue before us. They are traditional criminal proceedings, which are essentially accusatory, adversary and punitive. Consequently, they involve considerations which are not relevant to the non-criminal *parens patriae* proceedings of the Juvenile Court." United States v. Dickerson, 106 U.S.App.D.C. 221, 271 F.2d 487, 491 (1959).

In commenting on the above, Judge Paul W. Alexander of the Common Pleas Court of Lucas County, Ohio, stated:

"These trenchant last words leave little more to be said. In our American culture, there are now four institutions, each charged with certain distinctive responsibilities in the upbringing of children in the way they should go. They are home, church, school and juvenile court, the latter said by *Roscoe Pound* to be the greatest forward step in Anglo-American jurisprudence since the Magna Charta. To deny the juvenile court a fair trial is to deny the child himself a fair trial. To deprive the court of its rightful status, to impair its potential effectiveness is to deprive a child of not merely constitutional rights but of many invaluable rights regarded as the birthright of every American child. It is like denying a sick child the right to a good hospital. * * * Justice to a child must be more than due process of law and fair legal treatment. .No abstract right can be as sacred as a human child." (Emphasis supplied.) [4]

The following have been listed by the National Probation and Parole Associa-

tion as desired qualifications of a juvenile-court judge:

The experiences of an attorney who has been successful in practice and who is conversant with the rules of law and the ways of the courtroom.

Intellectual flexibility and the capacity to absorb the elements of new disciplines, particularly in the behavioral sciences, and to utilize the guidance and skill of professionally trained people in these various disciplines.

An emotional capacity for understanding, sympathy, and dedication to his task of helping people, coupled with a strong sense of fairness.

The will to work hard and the physical stamina to put in long hours.

The ability to see community needs and the capacity to act as a leader in helping the community develop or create services and facilities for the welfare of children and families.

The willingness and capacity to work with all interested people and agencies who want to help children and families.

Humility toward his responsibilities —humility that is derived from a critical self-awareness of his intellectual and emotional weaknesses and biases.

These qualifications provide a background against which every judge may wish to examine himself toward doing a better job. He can affect for the better the lives of countless individuals, and the effects of his approach and his decisions will carry over long after he has left the bench. The breadth of this influence is seen in the words of Dean Roscoe Pound:

"*The establishment of the juvenile court is one of the most significant advances in the administration of justice since the Magna Charta.*" (Emphasis supplied.)[5]

Apart from the summary punishment aspect, the Fourth and Fifth Amend-

4. American Bar Association Journal, Vol. 46, p. 1210 (1960).

5. "Guides for Juvenile Court Judges" (New York, 1957), p. 127.

ments simply prohibit the incarceration of persons—including juveniles—without a prior judicial determination of probable cause to believe that the person has committed an offense—"nor shall any person * * * be deprived of * * *, liberty, * * * without due process of law."

There is a provision in Kentucky Revised Statutes, 208.110(3) requiring the peace officer who has taken the child into custody to notify the parents and to release the child to his parents, "[u]nless the nature of the offense or other circumstances are such as to indicate the necessity of keeping the child in secure custody, or unless other directions have been given by the court." No notification was given to the parents in this case. It must be conceded that the nature of his offense or of any other circumstances was not such as to indicate the necessity of keeping the child in secure custody. When taken to the jail, the child asked to be allowed to telephone his father, or to have someone telephone his father to tell him where he was and what had happened to him. This request was absolutely refused. In any case, a person arrested is allowed one telephone call to his family, or friends, or lawyer. The only excuse for not allowing the child to call his father when he was arrested must then be that other directions were given by the court. The willingness of the court to order confinement without having seen or heard from the boy and without having personally observed his conduct or his character, indicates to us that his order was not merely an isolated act, but instead the usual treatment given to all juveniles arrested for being out after curfew. Where a judge adopts the same treatment for all persons having committed a similar offense, however trivial, such treatment is summary and arbitrary and must be set aside.

It is emphasized by counsel for defendants that the boy was charged with violation of state statutes, and it is not within the jurisdiction of a federal court to pass upon the validity of state stat-

utes; but, in this case, the violation of the state statutes constituted a violation of the boy's rights under the Federal Constitution.

We are of the opinion that the constitutional rights of plaintiff's son were violated, as heretofore set forth. By failing to arraign the boy and by keeping him in custody, denying him any rights to communicate with his parents, and without releasing the boy to his parents in accordance with the Kentucky statutes, and by failing to give notice of the cause of his arrest within the earliest practicable time, he was deprived of his liberty in violation of the Fourth and Fifth Amendments of the Federal Constitution. See United States v. Hegstrom, (2nd Cir.) 178 F.Supp. 17, 20.

The judgment of the District Court is set aside and the case remanded. On the hearing on remand, the District Court may take such evidence from either party as appears proper and make such findings as the court deems appropriate.

WILLIAM E. MILLER, Circuit Judge (concurring in the result).

The complaint in this action was filed as a class action seeking injunctive, declaratory and general relief, because of the defendants' alleged violation of plaintiff's rights under the Fourth Amendment, the Eighth Amendment and the equal protection and due process clauses of the Fourteenth Amendment to the Constitution of the United States. Jurisdiction is predicated upon 28 U.S.C. Secs. 1331, 1343(3) and (4), and 2201 and 2202, and Title 42 U.S.C. Sec. 1983.

The specific prayer of the complaint is:

1. That a declaratory judgment be issued to the effect that:

    (a) The Defendants Vogelsberg and Kirby have failed to comply with the laws of Kentucky and the requirements of the Constitution of the United States in their procedures for the arrest and custody of juveniles.

**1356**

(b) The named Defendant Robert Turley is not conducting, at the present time, the Juvenile Division of the Madison County Court in accordance with the laws of the State of Kentucky and the requirements of the Constitution of the United States, in particular, the 4th Amendment, the 8th Amendment, and the due process and equal protection clauses of the 14th Amendment thereto.

(c) The Placement of Juveniles in the Madison County Jail by the Defendant Turley, and the retention of those juveniles in the Madison County Jail by the Defendant Douglas violates the laws of the State of Kentucky and the requirements of the Constitution of the United States.

(d) The Fiscal Court of Madison County has failed to provide proper detention facilities for juveniles brought before the Juvenile Division of the Madison County Court in violation of the laws of the State of Kentucky and the requirements of the Constitution of the United States.

2. Grant restraining orders, preliminary and permanent injunctions preventing Defendants, their agents, employees, successors in office and all others acting in concert with them from placing juveniles in the Madison County Jail.

3. Retain jurisdiction of this case.

4. Grant Plaintiffs such other relief as may be equitable and just to this Court.

The class of persons plaintiff seeks to represent is fully set forth in Judge McAllister's opinion.

It is thus clear that the complaint does not challenge the right of the State of Kentucky to prosecute Duane Cox on the curfew charge, nor does it seek to nullify or enjoin the pending state court prosecution on such charge. Neither does the complaint in any manner seek a declaration that the state court proceeding against the juvenile for the alleged violation of Kentucky law is void.

If the complaint sought to enjoin the state proceeding against the juvenile, which is at least quasi-criminal in character, it might run counter to the rulings of the Supreme Court in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), inasmuch as the state prosecution was pending before the Kentucky Juvenile Court at the time the present action was filed, and was not merely a threatened prosecution.

Consequently, the action is maintainable pursuant to 42 U.S.C. Sec. 1983 before the state prosecution has been completed (a) because the action is not intended as one to enjoin or disrupt the state prosecution, and (b) because the relief sought is essentially to redress the alleged violations of the constitutional rights of the plaintiff and the class he represents, arising from the procedures alleged to be employed in Madison County, Kentucky, in connection with the arrest, detention and trial of juveniles on criminal charges.

Complaint is made chiefly with respect to three features of the procedures:

(1) That the plaintiff and juveniles similarly situated are arrested and detained for trial for an unreasonable time without receiving the benefit of a probable cause hearing.

(2) The plaintiff and juveniles in the same class are confined in adult jail facilities in Madison County, Kentucky awaiting trial for an unreasonable time under conditions causing cruel and unusual punishment in violation of the Eighth Amendment to the Federal Constitution.

(3) The plaintiff and juveniles in the same class are required to stand trial on criminal charges in said county before lay judges who are neither lawyers nor learned in the law and are thus deprived of both due process of law and the equal protection of the law. The

district judge in an able opinion discussed each one of these contentions in detail and held that they were without merit. His rulings, however, were made upon a motion to dismiss the complaint without the benefit of an evidentiary hearing.

Judge McAllister's opinion makes only passing reference to the use of non-lawyers as juvenile court judges, and I do not construe the opinion to hold that this practice is offensive to any requirement of the federal constitution. Nevertheless, it is clear that Judge McAllister's opinion, in rather sharp terms at least, adversely criticizes the practice without actually ruling that it is unconstitutional. On this point, since the opinions remands the case to the district court for appropriate findings, I construe it to mean that the issue of non-lawyer juvenile court judges is left open so that the district court on remand will be free to make an independent determination. However, I am not prepared at this time to express an opinion or to join in the implied criticism of the Kentucky practice, in effect in at least certain areas of that state and in general use to a large extent throughout the United States.

It is, of course, well settled that a juvenile, like an adult, is entitled to a probable cause hearing before being arrested and detained on a criminal charge, preferably before incarceration or at least within a reasonable time thereafter. Brown v. Fauntleroy, 143 U.S.App.D.C. 116, 442 F.2d 838 (1971); Cooley v. Stone, 134 U.S.App.D.C. 317, 414 F.2d 1213 (1969). While the facts alleged in the complaint would tend to indicate that the juvenile in this case was not accorded a probable cause hearing within a reasonable time, I am of the opinion that no definitive ruling should be made on this point until, on remand, the district court has conducted an evidentiary hearing to determine the circumstances under which the arrest was made and under which the plaintiff was held in confinement. The question of reasonableness should be determined on the basis of the individualized facts of each case. We will be in better position to evaluate the facts in regard to this aspect of the case after the district court has conducted an evidentiary hearing and made appropriate and detailed findings of fact and conclusions of law.

In my view, the opinion of Judge McAllister goes much too far in dealing with cruel and unusual punishment. The opinion may even be read to reflect an outright holding that a juvenile is subjected to cruel and unusual punishment in any case where he is confined in an adult jail facility. I do not agree with this conclusion. The exact nature and circumstances of the confinement of the juvenile in each case must be determined before a court would be in position to say that the juvenile had been subjected to cruel and unusual punishment. The mere fact of confinement in an adult jail facility, particularly in a small county jail like the one in Madison County, Kentucky, is not sufficient in and of itself to warrant a finding of cruel and unusual punishment. I do not agree that there is anything in the present record to justify the inference repetitively indicated in the opinion, that the juvenile was thrown in with the "general prison population," if there was such a population at the time in this small county jail. We certainly are not warranted in taking judicial notice of any particular condition in the Madison County, Kentucky, jail nor to conclude without proof that the juvenile in this case was required to be exposed to adult or hardened criminals. We simply do not know the conditions of the juvenile's confinement, and we should not express an opinion until the facts have been established. Most clearly the complaint does not depict the conditions of the youth's actual confinement in such lurid terms as does the Court's opinion.

If the opinion is to be taken at face value, it would hold that federal courts have the power, by construing the federal constitution, specifically the Eighth Amendment, to require states to install separate jail facilities or detention cen-

ters for juveniles throughout their entire systems. I do not believe that we have such authority or that the Eighth Amendment imposes any such requirement. The question of cruel and unusual punishment must be determined on a case by case consideration and on the basis of the actual nature and character of any given confinement. The opinion is replete with references to the horrors of confining juveniles with hardened adult offenders and criminals, even including a reference to a Reader's Digest article of November, 1973, but the difficulty is that these general citations have no legal or authoritative value whatever and as far as we know at the present time have no relevance to any conditions which prevailed in Madison County, Kentucky, or in connection with plaintiff's confinement.

The only specific reference in the complaint to cruel and unusual punishment is contained in paragraph #12, which reads as follows:

> The Plaintiff Duane Cox is a sixteen year old child who was held in an adult jail facility. There are no medical facilities, recreational or educational facilities in the jail or evaluative programs available to the child. He was not provided physical or psychological treatment programs. Specifically, the Plaintiff Duane Cox was not provided adequate medical examinations or treatment, recreation activities or equipment, soap, towels, education, books, or reading material. In addition, no social services were provided to benefit the child or class member.

This paragraph in my view falls far short of establishing cruel and unusual punishment under the Eighth Amendment and it certainly falls far short of the exacerbated conditions of confinement painted with such a broad brush in the opinion of the Court.

As the complaint was dismissed by the district court on a motion to dismiss without an evidentiary hearing, that court had no occasion to make findings of fact as to the class action issue. On remand, this question will be open and the court should make appropriate findings to indicate whether the action is properly filed as a class action. Following his findings and conclusions, on remand, the district court should then proceed to indicate any relief to which the plaintiff is entitled individually or as the representative of a class, including any injunctive or declaratory relief, or any other form of relief under the general prayer.

Because I am persuaded that the complaint contained sufficient allegations to warrant an evidentiary hearing, I concur in the result reached in Judge McAllister's opinion.