Howard PERRY et al., Appellants,

v.

William R. BANKS and Merle Johnson, Minority Members, Knox County Election Commission, Appellees.

Supreme Court of Tennessee.

March 10, 1975.

Arnett, Draper & Hagood, Foster D. Arnett, Knoxville, Charles A. Maner, Jr., Law Director, for appellants.

William R. Banks, Merle Johnson, Knoxville, for appellees.

OPINION

HARBISON, Justice.

This is a suit for declaratory judgment, seeking a determination of the eligibility of two candidates to hold the office of County Judge of Knox County, Tennessee.

The basic question presented in the trial court was whether the County Judge of Knox County must be a lawyer.

The two Democratic members of the Knox County Election Commission filed this suit on July 17, 1974 against the three Republican members together with a Republican and an Independent candidate for the office of County Judge in the General Election to be held on August 1, 1974. They insisted that the County Judge of Knox County is required to be "learned in the law", and that neither the Republican nor the Independent candidate met this qualification.

Plaintiffs below sought a temporary restraining order, prohibiting the Election Commission from placing the names of the defendant candidates on the Ballot and a declaration as to their eligibility.

The two candidates, Kessel and McMillan, by counter-claim and cross-claim, sought a declaration of their eligibility to hold the office of County Judge.

The three Republican members of the Election Commission asked for affirmative relief in their answer and requested that the eligibility of the two candidates be determined.

In effect, all parties, in their respective pleadings, sought essentially the same relief.

A hearing was conducted on July 20, 1974 before Honorable W. H. Inman, Chancellor, sitting by designation because of the recusal of both Knox County Chancellors. The Chancellor ruled that the office of County Judge of Knox County must be filled by a person learned in the law and directed the Election Commis-

sioners to remove the names of Kessel and McMillan from the ballot.

Pursuant to a post-judgment motion the Chancellor, on July 24, 1974, modified his ruling and permitted Kessel and McMillan to remain on the ballot but enjoined the issuance of certificate of election in the event either should be the apparent winner, pending a final adjudication of this controversy.

At the ensuing General Election, held on August 1, 1974, both Kessel and Banks were defeated.

Thus it is that by the time this controversy reached this Court, the questions presented had been deprived of practical significance and were academic and abstract in character, insofar as the general election of 1974, these particular parties and this particular Election Commission are concerned.

Despite the result of the election, an appeal has been perfected to this Court by the Republican members of the Election Commission and by one of the defeated candidates, seeking a review of the judgment of the Court below.

In the opinion of the majority of the members of this Court, the issues in this case were rendered moot by the outcome of the General Election held on August 1, 1974. It accordingly results that, without expressing any opinion as to the correctness of the decision of the Chancellor on the issues before him, the appeal will be dismissed as moot at the cost of appellants.

COOPER and BROCK, JJ., concur.

HENRY, J., and FONES, C. J., dissent.

HENRY, Justice (dissenting).

The Chief Justice and I respectfully dissent.

After the argument of this action, it fell my lot to draft an opinion for the consideration of my brothers. After a series of conferences the majority concluded that the issues in this case were rendered moot by the outcome of the General Election held on August 1, 1974. The Chief Justice and I disagreed and advocatd the opinion I had previously written for the Court. We adopt that opinion as our dissent. Omitting the statement of the case, the proposed opinion which we here adopt reads as follows:

In our view this case presents issues of overriding, recurring and substantial public importance. Potentially the vast majority of county election commissions may face this question at any given general election. It demands resolution lest it become an issue "capable of repetition, yet evading review". Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). Involved are public rights or interests under conditions which may be repeated at any time. McCanless, Com'r. v. Klein, 182 Tenn. 631, 188 S.W.2d 745 (1945); State v. Thornton, 492 S.W.2d 912 (Tenn.1973); Walker v. Dunn, 498 S.W.2d 102 (Tenn.1972). Hence we take jurisdiction.

The primary question before the Court is whether the County Judge of Knox County must be a lawyer. The answer to that question demands a determination as to the applicable law.

Chapter 148 of the Acts of 1887, captioned, "An Act to create and regulate the office of County Judge of Knox County", provides, in Sec. 1, for the election of a County Judge by the qualified voters and provides that he

(s)hall be thirty years old and . . . a citizen of Knox County, and a person of good moral character.

Under this enactment there is no requirement that the County Judge be a lawyer.

Chapter 66 of the Private Acts of 1911, by the Davidson County delegation, is "An Act defining the necessary qualifications of the County Judge in counties having a population of not under one hundred and

forty-nine thousand (149,000) nor over one hundred and ninety-one thousand (191,000) by the Federal Census of 1910 *or any future Federal census."* Sec. 1 provides

> That to be qualified to hold the office of · County Judge . . . *a man* shall for over five years be a freeholder or householder and resident of the county, not under thirty years of age, of business training and experience, and *learned in the law.* (Emphasis supplied)

The record shows that Knox County grew into this population bracket. We judicially note that the Federal Census of 1930 showed that Knox County had a population of 155,902.

Sec. 17–119 T.C.A. provides, in part, as follows:

> In addition to the qualifications provided for judges by article 6, §§ 3 and 4 of the Constitution of Tennessee, judges of the Supreme Court, Court of Appeals, chancery courts, circuit courts, and criminal courts, and courts exercising the jurisdiction imposed in one or more of the last three (3) named courts *shall be learned in the law,* which must be evidenced by said judge being authorized to practice law in the courts of Tennessee . . . (Emphasis supplied)
>
> \*　\*　\*　\*　\*　\*
>
> Provided, however, this section shall not apply to judges of the county courts . . . except in those counties where such judges . . . exercise general criminal jurisdiction normally exercised by the criminal and circuit courts; jurisdiction of purely civil cases wherein a jury is provided for, except insanity proceedings and condemnation of land proceedings; and jurisdiction to hear and determine divorce cases.

Chapter 148, Acts of 1887 has not been repealed although it has been amended, in immaterial particulars, a number of times.[1] As aforesaid, it does not require that the County Judge be a lawyer.

It is earnestly insisted by the appellees that Knox County has grown into Ch. 66, Private Acts of 1911. This Act was originally designed for Davidson County, but, as we have noted Knox County "grew into" the specified population bracket as a result of the 1930 Federal Census.

This Court has held that a statute made applicable to a county or counties within certain population brackets according to the last Federal Census or any subsequent federal census is constitutional; that it applied to all counties coming within its provisions when passed; that it remains in force and effect notwithstanding subsequent population changes and it may become applicable to other counties when their population becomes such as to bring them within the specified population brackets. Hall v. State, 124 Tenn. 235, 137 S. W. 500 (1910); Horbert v. Mabry, 166 Tenn. 290, 61 S.W.2d 652 (1933).

The language of Mr. Justice Cook, in Williams v. State, 155 Tenn. 364, 293 S.W. 757 (1927) is appropriate:

> The validity of statutes limited in their application to particular counties by reference to the federal census has been sustained in a great number of cases. The doctrine has been announced repeatedly that such acts are valid if, under their provisions, all counties may, when the required conditions arise, fall within the class and obtain the benefits of the law. However far-fetched might seem the rule and however vicious maybe considered the practice which produces laws through legislative courtesy, by force of the will of the representative or representatives for a single county, the doctrine that classification by reference to the federal census, if otherwise unobjectionable, is permissible cannot be repudi-

---

1. Sec. 5. amended, 1911, Ch. 46, p. 121; 1917, Ch. 528, p. 1631 (repealed, 1951, Ch. 79, p. 211); 1927, Ch. 719, p. 2341 (repealed, 1951, Ch. 79, p. 211); 1941 Ch. 223, p. 806 (repealed, 1951, Ch. 79, p. 211); Sec. 7 amended, 1951, Ch. 79, p. 211.

cated after long adherence of its application in adjudicated cases sustaining certain statutes upon particular subjects. It could not be repudiated without producing more or less confusion in every county of the state.

We do not repudiate the doctrine en 'oto; however, we reject the notion that any county must mandatorily abandon the laws under which it operates in favor of laws applicable to other counties, by the mere circumstance of a slight change in population. Such a result would be haphazard and chaotic at best; dangerous and irresponsible at worst.

We recognize that a county within the classification at the time of the adoption of an Act does not leave the classification by virtue of a population change, but we are not prepared to say that a county automatically grows into an Act, or drops into it and is thereafter forever "locked in."

We hold that prior to the revision of Art. 11, Sec. 9 of the Constitution of Tennessee a county may have elected to bring itself into the classification by affirmative action,[2] but that no county was thrust, automatically, into compliance with the laws applicable to another county and forced to relinquish its own systems and procedures by the mere circumstance of a population change.

Art. 11, Sec. 9 of the Constitution of Tennessee embraces what is commonly known as the "Home Rule" amendment, and reads, in part:

. . . any act of the General Assembly private or local in form or effect applicable to a particular county or municipality either in its governmental or its proprietary capacity shall be void and of no effect unless the act by its terms either requires the approval by a two-thirds vote of the local legislative body of the municipality or county, or requires approval in an election by a majority of those voting in said election in the municipality of county affected.

Applying a private act to a county by the application of judicial precedent would be tantamount to a judicially ordained departure from the Constitution of our state. We, therefore, hold that since the adoption of this amendment in 1953, a county may no longer grow into, or drop to, an act designed for another county.

We fully realize that Knox County grew into the appropriate population bracket long before the adoption of this constitutional provision.

But we are asked now to hold that the 1911 Act is applicable to Knox County without the people of the county, its elected representatives in the General Assembly or its Quarterly Court having any voice in the matter, or phrasing the matter another way, without any affirmative action on its part. Such a holding would be contrary to the clear intent of the basic Charter of our state, as it presently exists and would be impermissible under the rules we here announce.

We, therefore, hold that Chapter 66 of the Acts of 1911 does not now have, and has never had, any application to Knox County.

This holding is bolstered by the fact that the General Assembly has, from time to time, amended the 1887 Act under which the County Judge of Knox County operated, thus evincing a legislative knowledge and intent with respect to the applicability of this Act to Knox County.

This is not to say, however, that the qualifications of the County Judge of Knox County are governed by the 1887 Act.

It is a matter of Tennessee history, of which this Court is acutely aware, that in

---

2. e. g., by resolution of the Quarterly Court; by the commencement of operations under the Act by causing the Act to be amended by its own legislative delegation; or by any other affirmative act showing an intention to come within the Act.

1960 a Nashville layman became a candidate for membership on the Supreme Court. See Freeman v. Felts, 208 Tenn. 201, 344 S.W.2d 550 (1961).

This fiasco resulted in the adoption by the General Assembly of Acts 1961, ch. 283, Sec. 1 of which appears in the Code as a portion of Sec. 17–119, as heretofore set forth, and provides that certain judges shall be learned in the law as evidenced by being authorized to practice law.

By 1965, Chapter, 85, Section 1, Sec. 17–119 was amended so as to exempt county judges except those exercising certain jurisdiction. See supra.

These two enactments, along with Articles 3 and 4 of the Constitution, constitute the general law of this state with respect to the qualifications of judges.

Applying this general law specifically to the office of County Judge, it is readily apparent that such judge must:

a. be thirty years of age

b. have been a resident of the State for five years next preceding his election

c. have been a resident of his county for one year next preceding his election

d. be learned in the law (authorized to practice law) if, but only if, he has general criminal jurisdiction normally exercised by the criminal and circuit courts, or tries jury suits (except insanity and condemnation proceedings) or hears divorce cases.

Absent these excepted jurisdictional areas, there is no requirement, in the Constitution or statutes of Tennessee, that a County Judge be a lawyer. The record reflects that the County Judge of Knox County does not have or exercise any of the exceptional jurisdiction referred to in the statute.

However, there are other controlling considerations in the determination of the question of whether a County Judge must be a lawyer.

Since we have taken jurisdiction of this case on the basis of its presenting an issue of recurring public importance, capable of repetition, yet evading review, this opinion must necessarily seek to clarify the law with respect to the office of County Judge in Tennessee.

The right to counsel, as ordained by the Sixth Amendment to the Constitution of the United States, has taken on new dynamic and far-reaching significance.

We note that in the absence of special statutory provisions for Juvenile Courts, County Judges or chairmen of the County Court are also Juvenile Judges. Sec. 37–202(8) T.C.A.

We judicially note that only 15 of 95 county judges in Tennessee are lawyers. We are not advised as to how many of the 80 non-lawyer judges hold juvenile court but, we would surmise that a substantial number—perhaps most—hold such courts.

The Supreme Court of the United States has declared that a juvenile defendant is entitled to counsel at any proceeding which could result in his confinement. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed. 527 (1967). It was in *Gault* that Justice Potter Stewart observed:

In the last 70 years many dedicated men and women have devoted their professional lives to the enlightened task of bringing us out of the dark world of Charles Dickens in meeting our responsibilities to the child in our society.

The National Probation and Parole Association has established certain qualifications for juvenile court judges. The first qualification is: the experience of an attorney who has been successful in practice and who is conversant with the rules of law and the ways of the courtroom.

There is involved something that "shocks the most fundamental instincts of civilized man", when a child is taken before, what

**554**

Judge McAlister, in Cox v. Turley, 506 F. 2d 1347 (1974) described as

(a) lay judge who knows nothing of the treatment to be accorded citizens, due to lack of experience and training in the rigorous discipline of the law.

We condemn the practice and hold that from this day forward in Tennessee a child shall never be arraigned or tried, by a non-lawyer judge.

Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972) requires representation by counsel at the trial of any criminal proceeding which can result in loss of liberty whether it be categorized as petty, misdemeanor, or felony.

Coleman v. Alabama, 399 U.S. 1, 90 S. Ct. 1999, 26 L.Ed.2d 387 (1970) guarantees the right to counsel at a preliminary hearing, as does our recent case of McKeldin v. State, Tenn., 516 S.W.2d 82, 1974.

These, and other cases, merely delineate the advancing standards of due process.

The practice of permitting laymen to sit as judges in these type proceedings must be analyzed in the light of these standards.

"A fair trial in a fair tribunal is a basic requirement of due process." In re Muchison, 349 U.S. 133, 75 S.Ct. 623, 99 L. Ed. 942 (1955).

County Judges and Chairmen in Tennessee have jurisdiction under the Mental Health Law of 1965.[3] It is unthinkable that any Tennessee citizen should be committed to a mental institution pursuant to proceedings conducted by a layman.

Section 33–313, T.C.A. requires that in any judicial proceeding for the hospitalization or admission of any individual to a mental hospital, the court shall appoint counsel to represent the individual if he is not represented.

Section 33–604 T.C.A. sets out the procedure, before the "judge or chairman of the county court", for the judicial hospitalization of an individual. It provides, in part:

(I)f no counsel is employed or appears to represent the person thought to be suffering from a mental illness, the court shall appoint some member of the bar to represent him and protect his rights and interests.

In Heryford v. Parker, 396 F.2d 393 (10th Cir. 1968) in holding that the mentally deficient were entitled to counsel at commitment hearings, the court said:

We do not have the distinction between the procedures used to commit juveniles and adults as in *Gault*. But, like *Gault*, and of the utmost importance, we have a situation in which the liberty of an individual is at stake, and we think the reasoning in *Gault* emphatically applies. It matters not whether the proceedings be labeled "civil" or "criminal" or whether the subject matter be mental instability or juvenile delinquency. It is the likelihood of involuntary incarceration—whether for punishment as an adult for a crime, rehabilitation as a juvenile for delinquency, or treatment and training as a feeble-minded or mental incompetent—which commands observance of the constitutional safeguards of due process. Where, as in both proceedings for juveniles and mentally deficient persons, the state undertakes to act in *parens patriae*, it has the inescapable duty to vouchsafe due process, and this necessarily includes the duty to see that a subject of an involuntary commitment proceedings (sic) is afforded the opportunity to the guiding hand of legal counsel at every step of the proceedings, unless effectively waived by one authorized to act in his behalf. (313 N.E.2d 855).

In re Fisher, Ohio, 313 N.E.2d 851 (1974) holds that in involuntary civil commitment proceedings the due process clause

---

3. Section 33–302 et seq. T.C.A.

of the Fourteenth Amendment requires the appointment of counsel. The Court said:

Because of scope and gravity of the constitutional rights involved and the serious deprivations of liberty resulting from involuntary civil commitment pursuant to R.C. 5122.15, we hold that the due process clause of the Fourteenth Amendment to the United States Constitution requires that individuals subject to involuntary civil commitment proceedings be advised of their right to be represented by counsel retained by them, or, if they are unable to afford counsel, that counsel will be appointed for them.

The California Supreme Court, in Gordon v. Justice Court for Yuba J. D. of Sutter City, 12 Cal.3d 323, 115 Cal.Rptr. 632, 525 P.2d 72 (1974) held that permitting a layman to preside over criminal trials of offenses punishable by jail sentences denies due process unless the accused waives the right to have an attorney judge preside.

The court said, *inter alia:*

We do not suggest that a fair criminal trial is impossible in a court presided over by a non-attorney judge, but only that the likelihood of such a trial would be substantially diminished.

It is elementary that the right to counsel schooled in the intricacies and complexities produced by the criminal law explosion of the last decade is diluted and may even be destroyed when basic constitutional rights are asserted before a judge who does not possess the skill and knowledge necessary to protect those rights, recognize the issues and resolve them according to established legal principles. There is an inherent inconsistency in guaranteeing the right to counsel without providing an attorney judge to preside at the hearing.

We hold that a County Judge in Tennessee who presides over any matter wherein the defendant has a constitutional or statutory right to counsel must be a lawyer.

We further hold that for a non-attorney judge to preside over any criminal trial, juvenile investigation, or hearing under the laws relating to the mentally ill or any other proceeding wherein a citizen may be deprived of his liberty, is violative of the Fourteenth Amendment to the Constitution of the United States and Art. 1, Sec. 8 of the Constitution of Tennessee.

We hold that so much of Sec. 17–119 T. C.A. as would permit lay judges to preside over "insanity proceedings" violates both constitutional provisions.

The advancing standards of due process compel this conclusion.

We do not hold that any county judge in Tennessee must be a lawyer. We simply hold that unless he is a lawyer he may not sit as juvenile judge, or preside over hearings relating to the mentally ill, or any other proceeding wherein a citizen may be deprived of his liberty.

We realize that this holding will require an adjustment in some counties and we recognize the patent injustice of an abrupt departure from past practices. We must, however, balance inconvenience against basic constitutional requirements. Pending appropriate legislative action, the Circuit and Criminal Court judges and chancellors of the state and any other judges not laboring under a similar handicap may perform the duties of the judges who do not meet these standards.

We take note of the fact that the County Judge in Tennessee is normally the chief fiscal officer of the county.

He is, in no sense, the Executive Head of the County Government, and therein lies the basic fallacy in the structure of County Government in Tennessee. Basically he is not a judicial officer and gradually the term "County Judge has become a misnomer.

While there is no conflict between the 1887 Private Act and Sec. 17–119 T.C.A., the latter, as a general statute applicable to

all county judges within the state for the evident and specific purpose of dealing with the qualifications of judges, must be regarded as controlling and as having superseded the earlier act. Trotter v. City of Maryville, 191 Tenn. 510, 235 S.W.2d 13 (1950).

We hold that the County Judge of Knox County is not required to be a lawyer, or to be learned in the law, or to be admitted and licensed in Tennessee.

We are motivated in this dissent by a sincere conviction that the problem of non-lawyer judges, far from being moot, is one of immediate concern. We cannot, in good faith, sit idly by, without noting the trends in American Jurisprudence and alerting the people of Tennessee to the imminence of changes which, if abruptly made, would have a devastating effect upon the judicial system of our state. We, therefore, take this means of calling attention to what we regard as an urgent problem affecting the people of Tennessee. Our courts, our counties and our legislature can better deal with this problem area with advance admonition. It is in this spirit, that we, with utmost deference, respectfully dissent from the views of our colleagues.