STATE of Tennessee ex rel. Randy ANGLIN, b/n/f Robert DeLaney

v.

Sammi MITCHELL, Superintendent, Tennessee Reception and Guidance Center; and C. Murray Henderson, Commissioner, Tennessee Department of Corrections.

STATE of Tennessee ex rel. Timothy Allen ANGLIN, b/n/f Robert DeLaney

v.

Howard G. COOK, Superintendent, Spencer Youth Center; and C. Murray Henderson, Commissioner, Tennessee Department of Corrections.

Supreme Court of Tennessee.

Jan. 21, 1980.

Rehearing Denied Feb. 25, 1980.

Rehearing Opinion March 10, 1980.

Robert DeLaney, Jerry P. Black, Jr., William J. Rold, Craig Soland, University of Tennessee Legal Clinic, Knoxville, for petitioner.

William M. Leech, Jr., Atty. Gen., Robert A. Grunow, Senior Asst. Atty. Gen., Nashville, for respondents.

## OPINION

HENRY, Justice.

These consolidated juvenile habeas corpus proceedings raise the significant issue of whether an adjudication of delinquency and a commitment to the Department of Corrections by a nonlawyer judge violate Article I, Section 8 of the Constitution of the State of Tennessee.[1]

The Chancellor responded in the affirmative. The Court of Appeals reversed. We affirm the Chancellor.

## I.

### Factual Background

Timmy and Randy Anglin are two of the seven children born to John and Effie Mae Anglin of Centerville. The Anglins have been separated for more than eight years, but are not divorced. John Anglin has a record of at least one arrest, drinks heavily and has a live-in arrangement with another woman.

Effie Mae Anglin is mentally retarded, has brain damage, and is in and out of Central State Hospital for stays of from ten to twelve days. She is "totally unable to discipline or supervise her children" and her home is "unkept and inadequate for the family needs." The petitioners reside variously with their parents; however, they live primarily with their mother. Apparently, this stems from their dislike of the woman residing with their father.

Timmy was fourteen years old at the time of the offense and hearing. He has a full scale I.Q. of 76, as measured by the Wechsler Intelligence Scale for Children, which places him in the "borderline category of intellectual functioning as classified by the W.I.S.C." The probation report asserts that he is a "constant troublemaker" and lists a rather extreme background of infractions of good order and discipline and indicates a belligerent and antisocial attitude. He is a dropout from school with no future educational plans.

Randy was thirteen years old at the time of the offense and hearing. He has a full scale I.Q. of 84, as measured by the Wechsler Intelligence Scale for Children. This places him low in the "Dull Normal" category and only six points above the borderline category. Randy's record of infractions is not as extensive as Timmy's. The probation report, while recognizing that he has avoided serious trouble, suggests that he seems to enjoy doing illegal acts and has no remorse for them; that his attitude and behavior is worsening and he appears to be leaning toward the delinquent and violent type crimes. It "strongly" suggests that Randy be given "a very comprehensive mental evaluation."

Petitioners were arrested on Sunday, April 4, 1976, on charges of public profanity and the burglary of three record players from the Baptist Church at Centerville. They were placed in jail and the next day were released to the custody of their father.

Their cases were disposed of on April 13, 1976. The public profanity charge was dropped or retired. On the basis of a finding that each petitioner had "Committed 3rd Degree Burglary," and was delinquent, each was committed to the Department of Corrections for an indefinite period of time. See Section 37–237, T.C.A.

## II.

### Constitutional and Statutory Background

The Constitution of Tennessee contains no specific requirement that judges be "learned in the law," or that they be licensed or admitted to the practice of law.

The only constitutional requirement for judges of the Supreme Court is that they must be thirty-five years of age and must have been a resident of the state for five years before election. See Article VI, Section 3. Other judges must be thirty years of age, and must have been a resident of the state for five years and of the circuit or

---

1. Other issues are presented; however, in view of the disposition we make they are pretermitted.

district for one year before election. *See* Article VI, Section 4. Any additional requirements must be imposed by the legislature, which may supplement the minimum requirements of the Constitution so long as the additional requirements are reasonable and not inconsistent with our Constitution. *LaFever v. Ware*, 211 Tenn. 393, 365 S.W.2d 44 (1963).

It is an historic fact that the Tennessee Legislature did not deem it necessary or appropriate until 1961 to superimpose upon the constitutional requirements any qualifications which Tennessee judges must meet. In 1960, a layman became a candidate for the Tennessee Supreme Court, running against one of Tennessee's most distinguished justices. Then, as now, statewide judicial contests for the appellate judiciary attracted little voter attention; issues were virtually non-existent; financial considerations precluded any significant outlay of funds for campaign purposes, and voter participation left much to be desired. In the ensuing election, the layman's name appeared on the ballot in only 27 of 95 counties,[2] and he carried 13 of them.

This startling development galvanized the Tennessee General Assembly into action. The result was Chapter 283, Public Acts of 1961. By preamble, the Legislature declared:

Whereas, It was and is the purpose and intent of this provision [Article VI, Section 1 of the Constitution] to provide that the judicial power of the State shall be exercised by *persons qualified so as to act* ; and

Whereas, The qualifications of judges as prescribed in §§ 3 and 4 of said Article 6 do not purport to be exclusive of any *qualifications necessarily implied* in the Constitution in the creation of the Judicial Department; . . .. (Emphasis supplied).

Thereafter, the General Assembly ordained that:

judges of the Supreme Court, Court of Appeals, Chancery Courts, Circuit Courts, and courts exercising the jurisdiction imposed in one or more of the last three named courts, shall be learned in the law, which must be evidenced by said judge being authorized to practice law in the courts of Tennessee.

This exact language was carried forward into our Official Code and appears as a part of Section 17–119, T.C.A. It, of course, has no application to county judges, as such;[3] nor does it purport to apply to county judges holding juvenile court. However, its rationale is commanding. Any juvenile judge must be "qualified so to act" and this imperative is "necessarily implied in the Constitution" of Tennessee.

### III.

*Background of Tennessee Decisional Law*

Prior Tennessee cases are not helpful on the precise question we address.

In 1926, this Court, in considering an act creating the office of county judge in Sequatchie County and requiring that he be a person "learned in the law," held that this phase did not mean that the occupant must be a licensed attorney, but merely was a directive to the voters, a majority of whom settled the question. *Heard v. Moore*, 154 Tenn. 566, 290 S.W. 15 (1926). *See also Morrison v. Gower*, 154 Tenn. 624, 288 S.W. 731 (1926).

*LaFever v. Ware, supra*, dealt with the General Sessions judgeship of White County. The pertinent private act provided that the incumbent "shall be a licensed attorney." The Court held the phrases "learned in the law" and "licensed to practice law" to be synonymous and sustained the constitutionality of the act. While perhaps dicta, the Court made these significant and courageous observations.

---

2. *See Freeman v. Felts*, 208 Tenn. 201, 344 S.W.2d 550 (1961). The records of the office of Coordinator of Elections indicate 27 counties.

3. Chapter 85, Public Acts of 1965, amended Section 17–119 so as to exempt county judges

except those exercising certain jurisdiction. Section 17–119, along with Article VI, Sections 3 & 4, constitute the general law of this state with respect to the qualification of judges.

We do not see how it reasonably could be presided over by a layman. The duties are many and varied, including the power to hear and dispose of divorce cases. It is universally known that the trial and disposition of such cases touch nearly every facet of the law and *it is beyond the understanding of this Court that any person untrained in the law could think himself competent to discharge the complex duties of this office.* (Emphasis supplied). 211 Tenn. at 408, 365 S.W.2d at 50

This was over sixteen years ago—thirty-nine days before *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), requiring the state courts to appoint counsel for indigent defendants in felony cases. The relentless march of due process was just reaching the line of departure. Even then, our Supreme Court denounced the concept of lay judges handling matters of complexity.

In *State v. Freshour,* 219 Tenn. 482, 410 S.W.2d 885 (1967), this Court held that the General Sessions judge of Cocke County need not be authorized to practice law if otherwise qualified.

While not exhaustive, this enumeration of cases is sufficient to show the general nature of our decisional law. All were decided under statutory enactments. None even alluded to the "law of the land" or "due process" requirements of Article I, Section 8 of our Constitution. This is the only question we face.

This issue is not completely new to our courts; however, it has heretofore evaded review.

In 1975, the case of *Perry v. Banks,* 521 S.W.2d 549 (Tenn.1975), came before this Court. This was a declaratory judgment action wherein the basic question was whether the county judge of Knox County must be a lawyer. As a result of an election intervening between the judgment in the lower court and the hearing in this Court, the "questions presented had been deprived of practical significance." Therefore, three members of this Court dismissed the appeal as moot, and did not pass upon the issue.

Two members of the Court expressed the view that:

this case presents issues of overriding, recurring and substantial public importance. Potentially the vast majority of county election commissions may face this question at any given general election. It demands resolution lest it become an issue "capable of repetition, yet evading review." (citation omitted). 521 S.W.2d at 550

The dissenters in *Perry v. Banks* traced the history of the evolving standards of due process in relation to the Sixth Amendment right to counsel and stated that "[t]here is involved something that 'shocks the most fundamental instincts of civilized man,' when a child is taken before . . . (a) lay judge who knows nothing of the treatment to be accorded citizens, due to lack of experience and training in the rigorous discipline of the law.' " 521 S.W.2d at 553–54.

Further, the dissenting members said:

It is elementary that the right to counsel schooled in the intricacies and complexities produced by the criminal law explosion of the last decade is diluted and may even be destroyed when basic constitutional rights are asserted before a judge who does not possess the skill and knowledge necessary to protect those rights, recognize the issues and resolve them according to established legal principles. There is an inherent inconsistency in guaranteeing the right to counsel without providing an attorney judge to preside at the hearing. 521 S.W.2d at 555

The dissenters, therefore, held "that for a non-attorney judge to preside over any criminal trial, juvenile investigation, or hearing under the laws relating to the mentally ill or any other proceeding wherein *a citizen may be deprived of his liberty,* is violative of the Fourteenth Amendment to the Constitution of the United States and Article I, Section 8 of the Constitution of Tennessee. (Emphasis supplied). 521 S.W.2d at 555.

There the matter stood until the Court of Appeals for the Middle Section handed

down its decision in the companion cases of *State v. Williams* and *State v. Wiser*, on June 27, 1975. These cases involved the trial and commitment of two juveniles before a nonlawyer judge. Judge Drowota, in a brilliant opinion, took note of the advancing standards of due process and held that "the fundamental fairness required by the due process clause of the Fourteenth Amendment of the federal constitution and Article I, Section 8 of the state constitution require the use of an attorney judge." *State v. Williams*, Slip op. at 8 (Tenn.App. June 27, 1975).

> The language of the Court is compelling: We feel that it is inherently inconsistent to guarantee the right to counsel without also giving the defendant the right to have an attorney judge when the result of the proceeding is the deprivation of liberty. *A reasonable likelihood or probability of prejudice exists when lay judges preside over juvenile proceedings that result in incarceration.* Prejudice is likely or probable because legal proceedings have become increasingly complex and lay judges lack the requisite expertise to resolve complex legal issues and to comprehend and use counsel's legal arguments. (Emphasis supplied). Slip op. at 6

This Court granted certiorari in *State v. Williams*, 547 S.W.2d 895 (Tenn.1976), for the sole purpose of resolving "the single and significant issue of whether a non-lawyer juvenile judge may constitutionally incarcerate a juvenile or deprive him of his liberty." 547 S.W.2d at 895.

We noted that this was a question of "far-reaching significance," and "of vital public importance," which "this Court is ready to address" and "[t]he time is now opportune." 547 S.W.2d at 896. Unfortunately, the case came to us with a fatally defective bill of exceptions and on a record which failed to disclose the one indispensable fact, i. e., whether the convicting and

committing judge was a lawyer. We had no alternative but to affirm the lower court.

The time continues to be "opportune"; the question continues to be "significant" and of "vital public importance," and the issue continues to recur but evade review. Today, we respond.

## IV.

### *The Tennessee Juvenile Court System*

In the absence of special statutory provisions for juvenile courts, county judges or chairmen of the county courts are juvenile judges, in addition to their other duties.[4] Section 37–202(8), T.C.A. Hickman County operates under the general statewide law.

The General Assembly declared the public policy of the state, *inter alia*, to be:

> To provide a simple judicial procedure through which this chapter is executed and enforced and in which the parties are *assured a fair hearing on their constitutional and other legal rights recognized and enforced.* (Emphasis supplied). Section 37–201(4), T.C.A.

Upon a finding that a child is delinquent [has committed any act designated a crime, Section 37–202(3), T.C.A.], the Court has the discretion to "retain jurisdiction and control . . . until he or she shall have reached the age of twenty-one (21) years." Section 37–203(b)(3)(c), T.C.A. This, notwithstanding the Legal Responsibility Act of 1971 lowering the age of minority to age eighteen (18). Section 1–313, T.C.A.

While the Act contemplates informal proceedings, the law requires that minutes be kept. Section 37–224, T.C.A.[5] We have long held that the juvenile court is a court of record, *Kilgrow v. West*, 139 Tenn. 517, 201 S.W. 520 (1918); *Juvenile Court v. State, ex rel. Humphry*, 139 Tenn. 549, 201 S.W. 771 (1918), and the statute specifically so provides. Section 37–258(a), T.C.A.

**4.** Tennessee's juvenile court system was established by Chapter 600, Public Acts of 1970, and is contained in Title 37, Chapter 2, T.C.A.; Sections 37–201, *et seq.* The hearing in juvenile

court was conducted on April 13, 1976. We apply the law as it existed as of that date.

**5.** The record contains no indication that minutes were kept.

The right to "representation by legal counsel at all stages of any proceedings" is recognized, Section 37–226, T.C.A., as are other basic rights including: the right of confrontation, the privilege against self-incrimination, against extra judicial statements taken in violation of the Chapter or which would be constitutionally inadmissible in a criminal proceeding, and a prohibition against the use of illegally seized or obtained evidence. Section 37–227, T.C.A. The Act clearly contemplates full evidentiary hearings with the full panoply of constitutional safeguards, making it indispensable that these rights be *recognized* and protected by a judge having expertise in the field of law.

Upon a finding of delinquency (commission of a criminal act) various dispositional options are available to the judge, to include committing the child to the State Department of Corrections. Section 37–231, T.C.A. This commitment is for an indefinite time, Section 37–237(a), T.C.A., but the Commissioner, with the assent of the committing court, may discharge the child and terminate the custody, control and supervision. Section 37–237(g), T.C.A. An order of commitment based upon a finding of delinquency may only be set aside by the committing court for fraud, mistake, lack of personal jurisdiction or newly discovered evidence. Section 37–238(a) T.C.A.

Appeal is to the circuit court and must be taken within five (5) days, following the disposition, excluding Sundays, Section 37–258(a), T.C.A.; however, an appeal does not suspend the order of the juvenile court nor operate to release the child from custody. Section 37–258(b), T.C.A. Pending the hearing, the circuit judge *may* make the same temporary disposition of the child as the juvenile court, but pending the circuit court's temporary order, the order of the juvenile court remains in effect. Section 37–258(b), T.C.A.

This is the nature of the juvenile justice system. In its dealings with delinquent children—those who are charged with the commission of criminal offenses—it differs from the criminal courts only as to the disposition of the offender. In some instances the punishment is lighter; in others it is heavier. As an example, in this case an indefinite term for third degree burglary was a maximum sentence of seven years for Timmy and eight years for Randy. Had they been convicted in the criminal court system, as adults, the sentence of three (3) to ten (10) years would be served in approximately two years. There are variables which may add to or take from this figure.

This Court unanimously declared in *Patrick v. Dickson*, 526 S.W.2d 449 (Tenn.1975):

Indeed, the entire juvenile court structure, despite recent renovations and innovations, continues to constitute, in a large measure, a junior criminal court.

This characteristic of these courts was recognized by the Supreme Court of the United States in *Breed v. Jones*, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), wherein the Court points out that "there is a gap between the originally benign conception of the system and its realities" and observes that recent cases require "that [the] courts 'eschew the "civil" label of convenience which has been attached to juvenile proceedings' and that the juvenile process . . . be candidly appraised." 526 S.W.2d at 451

Later, this Court in *State v. Johnson*, 574 S.W.2d 739 (Tenn.1978), speaking through Justice Harbison, stated:

[C]ourts in recent years have emphasized that in practical effect persons involved in juvenile proceedings may be deprived of their liberty. Increasingly, concepts of the criminal law, and in particular constitutional principles designed to protect the rights of individuals charged with crime, have been deemed to be applicable to proceedings involving juvenile offenders. 574 S.W.2d at 741

It is this deprivation of liberty that causes us concern. The incarceration of a child deprives him or her of the happy pursuits and unforgettable joys of childhood's all too brief hour. Even worse than that deprivation is the undeniable fact that all too often reform schools do not reform; rehabilitation centers do not rehabilitate; happiness

does not seem to flourish in foster homes; and confinement seems to afford an opportunity to hone criminal technique and learn of new and more effective methods of criminal conduct. All too often these are but prep schools for future and further criminal activity. This is not avoided by confinement in youth centers. The psychological evils attendant upon confinement are not reduced. The Supreme Court in *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), made this pithy and pertinent observation:

> Ultimately, however, we confront the reality of that portion of the Juvenile Court process with which we deal in this case. A boy is charged with misconduct. The boy is *committed* to an institution where he may be restrained of liberty for years. It is of no constitutional consequence—and of limited practical meaning—that the institution to which he is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a "receiving home" or an "industrial school" for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. His world becomes "a building with whitewashed walls, regimented routine and institutional hours . . . ." Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, state employees and "delinquents" confined with him for anything from waywardness to rape and homicide. 387 U.S. 27, 87 S.Ct. 1443, 18 L.Ed.2d 546

See Mr. Justice Cooper's opinion in *Arwood v. State*, 62 Tenn.App. 453, 463 S.W.2d 943 (1970), expressing similar views.

We note that, according to the Tennessee Commission on Children and Youth, as of June 14, 1979, there were 101 juvenile judges (including 25 general sessions judges who exercise juvenile jurisdiction) in Tennessee. Only 35 or 34.6% of these were licensed attorneys. According to the Tennessee Law Enforcement Planning Agency, during the calendar year 1974, there were a total of 29,358 delinquency petitions filed in the juvenile courts of Tennessee. These delinquency petitions resulted in 2,469 commitments to juvenile institutions. *See* Tennessee Department of Corrections, Annual Report 1973–1974 (1975). Assuming that the commitments follow the percentages of nonlawyer judges this would indicate that during that year alone 1,613 Tennessee children were deprived of their liberty by judges who had no expertise or training in the law.

V.

*The Advancing Standards of Due Process*

The cavalier treatment given to this significant problem by the Court of Appeals for the Western Section to the contrary notwithstanding, due process is an evolving and advancing standard subjecting even old and established practices to close constitutional scrutiny. *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). That which we accepted without question in an earlier era, today we reject in view of evolving standards of fairness.

"Due process of law is the primary and indispensable foundation of individual freedom. It is the basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the state may exercise." 387 U.S. at 20, 87 S.Ct. at 1439–1440, 18 L.Ed.2d at 542.

If the constitutions by which we govern ourselves are to have continuing vitality and validity they must be sufficiently elastic to grow and expand and absorb and deal with the changes that have marked the evolution of our state and nation and point to its progress. This is why due process can never be a static doctrine of the law. It is not a legal cadaver embalmed in perpetuity. It is a living, breathing, vibrant and vital tenet of our political faith. As Cardozo once said, "A constitution states or ought to state, not rules for the passing hour but principles for an expanding future." And, as Frankfurter reminded in *Wolf*, "[B]asic rights do not become petrified as of any one time, . . . It is of the very nature of a free society to advance in its standards of

what is deemed reasonable and right." 338 U.S. at 27, 69 S.Ct. at 1361, 93 L.Ed. at 1785.

■ A basic requirement of due process is the right to a fair trial in a fair tribunal. *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1954).

■ Our federal constitution, through the Fourteenth Amendment, coins the phrase "due process of law." Our state constitution, through Article I, Section 8, expresses the same idea when it prohibits imprisonment and deprivation of life or liberty, but by "the law of the land." The origin of this phrase in the Tennessee Constitution is the Magna Carta. The "law of the land" proviso of our constitution is synonymous with the "due process of law" provisions of the federal constitution. *Daugherty v. State*, 216 Tenn. 666, 393 S.W.2d 739 (1965). We have previously held that the applicability of the law of the land clause of our state constitution is a fundamental issue which properly may be raised on habeas corpus. *State ex rel. Anglin v. Mitchell*, 575 S.W.2d 284 (Tenn.1979).

Anyone having any doubts as to the assertion that due process and the law of the land are advancing standards may quickly dispel those doubts by turning to the annotation under Article I, Section 8, appearing in Volume 1, T.C.A. For example, less than a century ago this Court was holding that imprisonment might be inflicted for failure to pay city fines, penalties and costs. *Mosley v. Gallatin*, 78 Tenn. 494 (1882). Less than three quarters of a century ago we were holding that a code section requiring the separation of "white and colored passengers" on street cars did not violate Article I, Section 8 of our Constitution. *Morrison v. State*, 116 Tenn. 534, 95 S.W. 494 (1905).

The greatness of our constitutions stems from their elasticity, their ability to expand to solve emerging problems and to guarantee a high order of individual rights, liberties and freedoms.

Nowhere is the advancing standard of due process better exemplified than in the succession of cases relating to the right to counsel.

In *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the Supreme Court, for the first time, held that the right to counsel is of a "fundamental character" embraced within the due process requirements of the Fourteenth Amendment. Under the facts of the case and where the offense charged was capital in nature, the Court found a due process violation. It, however, left open the question of "whether this would be so in other criminal prosecutions or under other circumstances."

In *Betts v. Brady*, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942), the Supreme Court held that refusal to appoint counsel in a felony case did not necessarily violate the Due Process Clause of the Fourteenth Amendment.

The landmark decision on the right to counsel is *Gideon v. Wainwright, supra.* Gideon, charged with a felony, defended himself after the trial judge had denied his request for counsel. The Court commenced its opinion by overruling *Betts v. Brady, supra.* The Court held that the Sixth Amendment right to counsel was "fundamental and essential to a fair trial" and was made obligatory on the states by the Due Process Clause of the Fourteenth Amendment.

Next, in chronological order came *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), involving a fifteen-year old boy who was committed as a juvenile delinquent to the Arizona State Industrial School in a hearing where he was not represented by counsel. The Court reversed, holding that he was denied due process of law. The crux of the Court's holding was that in juvenile delinquency cases that may result in confinement the Due Process Clause of the Fourteenth Amendment requires that the child or his parent be notified of his right to be represented by retained counsel, or if unable to afford counsel, that counsel be appointed to represent the child. Overall, this case stands for the broad principle that during a juvenile adjudicatory hearing the Due Process Clause

demands the essentials of due process and fair treatment. 387 U.S. at 30, 87 S.Ct. at 1445, 18 L.Ed.2d at 548.

Three years later in *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Supreme Court held that proof beyond a reasonable doubt was among "the essentials of due process and fair treat-. ment," during the adjudicatory stage. Taking note that the law of New York, under which this case arose, provides that an adjudication of delinquency is not a "conviction"; that it does not have the usual consequences of a felony conviction; that a cloak of protective confidentiality is thrown about the proceedings;[6] and of the "civil label of convenience" which has been attached to juvenile proceedings, the Court said:

> We made clear in [*Gault*] that civil labels and good intentions do not themselves obviate the need for criminal due process safeguards in juvenile courts, for "[a] proceeding where the issue is whether the child will be found to be 'delinquent' and *subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution."* (Emphasis supplied). 397 U.S. at 365–66, 90 S.Ct. at 1073, 25 L.Ed.2d at 376

The relentless march of the advancing standard of due process achieved substantial momentum in 1972 when the Supreme Court of the United States handed down its decision in *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), holding that absent a knowing and intelligent waiver, no person may be imprisoned for any offense, petty, misdemeanor or felony, unless he is represented by counsel at his trial.

Finally, in *Breed v. Jones,* 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), the Supreme Court declared that the double jeopardy clause of the Fifth Amendment, prohibited the trial in a higher court of a child already the subject of an adjudicatory hearing in a juvenile court. In reaching this conclusion the Court recognized the "gap between the originally benign conception of the system and its realities" and the Court's past response of making applicable in juvenile proceedings "constitutional guarantees associated with traditional criminal prosecutions." 421 U.S. at 528–29, 95 S.Ct. at 1785, 44 L.Ed.2d at 355.

It reaffirmed the *Gault* principle that a "proceeding where the issue is whether the child will be found to be 'delinquent' and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution," and that "the term 'delinquent' had 'come to involve only slightly less stigma than the term 'criminal' applied to adults." 421 U.S. at 530, 95 S.Ct. at 1786, 44 L.Ed.2d at 356. There the Court said:

> Thus, in terms of potential consequences, there is little to distinguish an adjudicatory hearing such as was held in this case from a traditional criminal prosecution. For that reason, it engenders elements of "anxiety and insecurity" in a juvenile, and imposes a "heavy personal strain." 421 U.S. at 530–31, 95 S.Ct. at 1786, 44 L.Ed.2d at 356

Further, the Court made it clear that it could perceive "no persuasive distinction" in the risk involved in a delinquency hearing "and a criminal prosecution, each of which is designed 'to vindicate [the] very vital interest in the enforcement of criminal laws.'" 421 U.S. at 531, 95 S.Ct. at 1786, 44 L.Ed.2d at 356.

Thus, we are instructed by the Supreme Court of the United States that the right to counsel is of a "fundamental character" embraced within the essential requirements of due process, that juvenile trials must accord with "the essentials of due process and fair treatment," that no person may be deprived of his liberty for *any* offense unless represented by counsel, and that there is virtually no distinction between a delinquency hearing in juvenile court and a criminal court trial for a like offense.

---

6. For similar provisions of Tennessee's Juvenile Court law, *see* Sections 37–233, 37–224, 37–251, and 37-252, T.C.A.

These conclusions, insofar as they relate to the services of counsel are largely bottomed on Mr. Justice Sutherland's oft-quoted observation in *Powell v. Alabama, supra* :

> Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He · requires the guiding hand of counsel at every step in the proceedings against him. 287 U.S. at 69, 53 S.Ct. at 64, 77 L.Ed. at 170

The right to counsel becomes "as sounding brass, or a tinkling cymbal," if there is not a concomitant right to a trial before a qualified judge. Extending the guiding hand of counsel is an idle gesture if there is absent the gingerly approach of a genuine judge. There is, perhaps, some warrant for a lay judge in the disposition of small offenses and due process is not offended; however, in juvenile delinquency cases, where loss of liberty for years is involved, there is no place for an untrained judge.

Justice Stewart, dissenting in *North v. Russell, infra,* voiced these apt sentiments:

> In a trial before such a judge, the constitutional right to the assistance of counsel thus becomes a hollow mockery—"a teasing illusion like a munificent bequest in a pauper's will." 427 U.S. at 343, 96 S.Ct. at 2716, 49 L.Ed.2d at 544

Justice Stewart's additional comments are significant:

> But even if it were not possible to demonstrate in a particular case that the lay judge had been incompetent or the trial egregiously unfair, I think that *any* trial before a lay judge that results in the defendant's imprisonment violates the Due Process Clause of the Fourteenth

Amendment. The Court has never required a showing of specific or individualized prejudice when it was the procedure itself that violated due process of law. "[A]t times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Estes v. Texas,* 381 U.S. 532, 542–543, 85 S.Ct. 1628, 1633, 14 L.Ed.2d 543. See *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663; *Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114. *Id.*

■ Virtually every facet of criminal law is involved in juvenile delinquency hearings. Judges at all levels, and active and knowledgeable practitioners, often dissent and disagree among themselves as they make an honest effort to resolve the complex issues being addressed daily by our criminal courts. We consider it beyond dispute that the dictates of fundamental fairness, the demands of common sense and the developing law of this modern era require that the state supply a law-trained judge in all of our criminal courts of record, which necessarily includes the juvenile criminal court, when conducting adjudicatory hearings in criminal cases. We cannot countenance one law for adult criminal offenders and a wholly different law for juveniles who are charged with an identical offense. ·

The fact that Tennessee today is served by many non-lawyer juvenile judges who are kindly, considerate and attuned to juvenile problems is of no constitutional consequence. Good intention is not enough. In dealing with these, "the least among us," constitutional considerations demand an honest answer to the simple question: "Why not the best?" This is all Due Process and the Law of the Land require; but they will not settle for less.

## VI.

### An Analysis of North v. Russell

The Court of Appeals and the State rely strongly on *North v. Russell,* 427 U.S. 328, 96 S.Ct. 2709, 49 L.Ed.2d 534 (1976).

We approach the case both from a standpoint of our concept of the relationship between the Supreme Court of the United States and the highest courts of the several states, and from an analytical viewpoint.

While we accord great deference to the Supreme Court of the United States and abide, without question, its declarations denouncing deviations from the Constitution of the United States, this does not relieve this Court from the sworn obligation to subject any given question to analysis and examination in the light of the Constitution of Tennessee, designed to determine whether our own constitution requires a greater protection.

Thus, although the Supreme Court in *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), held that the Due Process Clause of the Fourteenth Amendment did not assure the right to a jury trial in the adjudicatory phase of a state juvenile court, this Court, in *State v. Johnson*, 574 S.W. 739 (Tenn.1978), declared that a juvenile "charged with an offense which would constitute a felony" is entitled to a jury trial on appeal to the Circuit Court for a *de novo* trial.

Our Court of Appeals for the Western Section correctly and concisely held in *Merchants Bank v. State Wildlife Resources Agency*, 567 S.W.2d 476 (Tenn.App.1978):

A state court can not under a state constitution restrict the rights of its citizens contrary to the rights granted by the Federal Constitution; but a state court can grant to its citizens broader and more comprehensive rights under the state constitution than as allowed by the Federal Constitution. 567 S.W.2d at 479

In *State v. Williams, supra*, we recognized this principle thusly:

Assuming *arguendo* that the *North* principle is applicable to juveniles, this does not preclude our examination of the matter from a standpoint of the state constitution. 547 S.W.2d at 896, footnote 1

Finally, in *Miller v. State*, 584 S.W.2d 758 (Tenn.1979), the majority of this Court declared:

We are bound by the interpretation given to the *United States Constitution* by the Supreme Court of the United States. This is fundamental to our system of federalism. The full, final, and authoritative responsibility for the interpretation of the federal constitution rests upon the Supreme Court of the United States. This is what the Supremacy Clause means. However, as to Tennessee's Constitution, we sit as a court of last resort, subject solely to the qualification that we may not impinge upon the minimum level of protection established by Supreme Court interpretations of the federal constitutional guarantees. But state supreme courts, interpreting state constitutional provisions, may impose higher standards and stronger protections than those set by the federal constitution. It is settled law that the Supreme Court of a state has full and final power to determine the constitutionality of a state statute, procedure, or course of conduct with regard to the state constitution, and this is true even where the state and federal constitutions contain similar or identical provisions. *Oregon v. Haas*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Jankovich v. Indiana Toll Road Commission*, 379 U.S. 487, 85 S.Ct. 493, 13 L.Ed.2d 439 (1965). Thus, although state courts cannot interpret their state constitution so as to *restrict* the protections afforded by the federal constitution, as interpreted by the United States Supreme Court, they may *expand* protections on the basis of a textually identical state constitutional provision.

If this were not true the frictions of federalism would be fierce and frustrating and state supreme courts would be reduced to mere conduits through which federal edicts would flow. 584 S.W.2d at 760

In *North v. Russell*, five members[7] of the Supreme Court held that since, on appeal, a

---

7. Stewart and Marshall dissented; Brenner concurred in the results and Stevens did not participate.

*de novo* trial before a lawyer was available, the trial of an adult accused of a misdemeanor before a nonlawyer judge did not offend due process.

The differences between *North v. Russell* and the case at bar are glaring. There the defendant was an adult; here we deal with a minor. There the defendant was sentenced to 30 days in jail, fined $150.00 and stripped of his driver's license; here we are faced with confinements up to seven and eight years. There the offense was a misdemeanor; here it was a felony.

Other differences become apparent as the opinion progresses. The Court notes that "there is a wide gap between the functions of a judge of a court of general jurisdiction, dealing with complex litigation, and the functions of a local police court judge trying a typical 'drunk' . . .." 427 U.S. at 334, 96 S.Ct. at 2712, 49 L.Ed.2d at 539. Here, there is no gap between the functions of a juvenile judge in dealing with a child charged with burglary and those of a criminal court trying an adult on the same offense. Juvenile delinquency hearings literally bristle with tantalizing and technical questions of constitutional and statutory law.

The whole thrust of the Court's reasoning seems to be that "a defendant in Kentucky facing a criminal sentence is afforded an opportunity to be tried *de novo* in a court presided over by a lawyer-judge since an appeal automatically vacates the conviction in police court." 427 U.S. at 334, 96 S.Ct. at 2712, 49 L.Ed.2d at 539.

This is true under Kentucky law;[8] however, this is not the situation in Tennessee. An appeal from a juvenile adjudication does *not* automatically vacate the commitment. It operates as a complete and continuing denial of liberty unless and until the circuit court modifies the judgment of the juvenile court. Section 37–258(b), T.C.A.

The *de novo* remedy does not lessen the deprivation. In *Ward v. Monroeville*, 409 U.S. 57, 34 L.Ed.2d 267, 93 S.Ct. 80 (1972), the Court declared:

the State's trial court procedure [cannot] be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral and detached judge in the first instance. 409 U.S. at 61–62, 93 S.Ct. at 84, 34 L.Ed.2d at 271–72

The Court was speaking of the "the need for independent, neutral, and detached judgment," but as Mr. Justice Stewart pointed out in dissent in *North v. Russell*, "surely there can be no meaningful constitutional difference between a trial that is fundamentally unfair because of the judge's possible bias, and one that is fundamentally unfair because of the judge's ignorance of the law." 427 U.S. at 345, 96 S.Ct. at 2717, 49 L.Ed.2d at 545.

We cannot countenance and classify as constitutional any procedure whereby it is necessary that a citizen stand two trials in order to get one fair trial.

As Mr. Justice Stevens, who did not participate in *North v. Russell*, points out in *Ludwig v. Massachusetts*, 427 U.S. 618, 96 S.Ct. 2781, 49 L.Ed.2d 732 (1976), and as every trial lawyer will attest:

A second trial of the same case is never the same as the first. Lawyers and witnesses are stale; opportunities for impeachment that may have little or much actual significance are present in the second trial that were not present in the first; a witness may be available at one time but not the other; the tactics on cross-examination, or on the presentation of evidence, in the first trial will be influenced by judgment of what may happen at the second; the strategy of a nonjury trial may be different than in a proceeding before a jury. Clearly, if a defendant has participated in a full first-tier nonjury trial, his jury trial in the second tier is significantly different from the normal jury trial. 427 U.S. at 635–636, 96 S.Ct. at 2790, 49 L.Ed.2d at 744

To every trial lawyer a second trial of the same case is about as palatable as drinking

8. *See* Ky.Rev.Stat.Ann. Sec. 23.032 (1971), Ky.R.Crim.P. 12.06.

cold soup. A *de novo* hearing does not suffice. There is no place in the law for a second table nor may we say to a juvenile offender, "take an old cold 'tater and wait, we'll give you a fair trial on appeal."

The second thrust of the Court's opinion in *North v. Russell* is that "a defendant can have an initial trial before a lawyer-judge by pleading guilty in the police court, thus bypassing that court and seeking the *de novo* trial . . .." 427 U.S. at 337, 96 S.Ct. at 2713, 49 L.Ed.2d at 540.

Yes, in the case of a Kentucky misdemeanant (and one in Tennessee) but no, in the case of a juvenile offender. Section 37–229(b), T.C.A. And, the sentence goes immediately in effect, unless and until the circuit court acts on appeal.

The Court, in *North v. Russell*, also pointed out the insignificance of the sentence, speaking in terms of the disposition of "minor" cases. Again, we here deal with a felony and with loss of liberty for from seven to eight years. We have already pointed out the sentencing disparity. *See* Section IV, *supra.*

Kentucky law allows a misdemeanant 30 days within which to perfect an appeal. Ky.R.Crim.P. 12.04. A Tennessee juvenile must appeal in five (5) days, excluding only Sundays. Section 37–258(a), T.C.A.

We point this out only as a distinction between the adult rights of *North* and the juvenile rights in the case at bar. Here, two juvenile offenders, one a borderline defective and the other little better off, tried before a lay judge, without counsel (the lower court found a knowledgeable and voluntary waiver) and advised only by his father and a mentally defective mother, are charged with the knowledge that they can appeal in five days and get a *de novo* trial. This mocks constitutional due process.

We do not view *North v. Russell* as being applicable to the case at bar.

## VII.

### *Conclusion*

We hold, in the context of a juvenile commitment, that "the law of the land" provision of Article I, Section 8 of the Constitution of Tennessee does not permit a judge who is not licensed to practice law to make any disposition of a juvenile that operates to confine him or deprive him of his liberty.

We do not hold that a juvenile judge—or any other judge—must be a licensed lawyer to hold office or to exercise other duties and enjoy other jurisdictions.

Chapter 934, Public Acts of 1978, passed by the Legislature to implement the Constitutional Convention of 1978, provided *inter alia*, that the county executive would exercise all of the judicial authority formerly exercised by the county judge. This would include serving as juvenile judge in all counties except where such judges are "especially provided by statute." Section 37–202(8), T.C.A. In *Waters v. Ogle*, 583 S.W.2d 756 (Tenn.1979), we declared invalid so much of Chapter 934, Public Acts of 1978, as clothed the county judge with judicial powers, with the result that all counties in Tennessee having a county executive, but not having a special, statutory juvenile court, were placed in the position of not having a legally competent juvenile court. The Legislature is now in session. It must necessarily address the problems created by the decision in *Waters v. Ogle* and by this decision. In the interim, Tennessee has sufficient lawyer-judges to meet the temporary demands of the juvenile court system. Additionally the remedies provided by Section 17–225, T.C.A., are available.

This cause is remanded to the juvenile court at Centerville for an adjudicatory hearing before a legally competent judge.

Reversed and remanded.

BROCK, C. J., and FONES, J., concur.

COOPER and HARBISON, JJ., dissent.

COOPER and HARBISON, Justices, dissenting.

We respectfully dissent from the majority opinion.

Tennessee, like most of the older states in the Union, and like the United States itself, does not have, nor has it ever had, any constitutional requirement that judges have licenses to practice law. Nor do state statutes so require in all instances. Perhaps this is unfortunate. Possibly it is a situation that should be altered, either by legislation or by constitutional amendment. But in our opinion, however desirable such a change might be, it is not within the prerogative of the judicial department to order it. Nor does any provision of either the state or the federal constitution require it.

A constitutional convention meeting in Tennessee in 1977 proposed a revision to the judicial article of the state constitution which, among other things, would have required that judges be lawyers. This proposal was rejected at the polls by a substantial majority of the persons voting. The members of the judiciary, lay and lawyer alike, opposed the amendment on various grounds and were active in its defeat.

For this Court, at this date, to interpret the due process clause of the Tennessee Constitution to require that the judges hearing and disposing of certain types of cases be attorneys is, in our opinion, improper judicial legislation, no matter how well intended it may be. When the case of *North v. Russell*, 427 U.S. 328, 96 S.Ct. 2709, 49 L.Ed.2d 534 (1976), was pending before the Supreme Court of the United States, it was confidently predicted by many persons that the decision in that case would end the use of lay judges in the United States. It did not. The majority of the Court held that nothing in the due process clause of the Fourteenth Amendment requires that a judge of an inferior court be a licensed lawyer where there is an appeal provided to a second-tier court presided over by a lawyer and affording de novo review. Such is the Tennessee juvenile system, and, in our

opinion, the decision in *North v. Russell* is conclusive of the constitutional arguments advanced here. The majority has seen fit to rely upon a dissenting opinion in that case and to extend its rationale to the state constitution, despite prior decisions of the state courts that the due process clause of the state constitution is identical in scope and purpose with that of the federal. *See Daugherty v. State*, 216 Tenn. 666, 393 S.W.2d 739 (1965); *Kittrell v. Kittrell*, 56 Tenn.App. 584, 409 S.W.2d 179 (1966).[1]

Probably it would be desirable that juvenile judges be licensed attorneys. It would probably also be desirable that they have training in sociology, psychology, family counseling and other related subjects. Indeed, it is a fact of which the Court may take judicial knowledge that many, if not most, of the juvenile judges in the state are members of the Council of Juvenile Court Judges, which is provided for by statute, T.C.A. § 37–278 *et seq.* This council affords seminars and training to its members, lawyers as well as lay persons, to assist in the administration of the juvenile justice system. For this Court to assume that every lay person exercising juvenile jurisdiction has. "no expertise or training in the law" is utterly fallacious and totally undocumented in the record. To use that same assumption as a basis for interpreting the state constitution to require a law license for the exercise of an important segment of the statutory jurisdiction of such judges is, in our opinion, error of egregious proportions.

The Tennessee statutes dealing with juvenile offenders, like those of most other states, were idealistically conceived and have as their purpose the removal of such offenders from the regular criminal justice system, unless more serious offenders are transferred there pursuant to the provisions of T.C.A. § 37–234. The statutes contemplate "a simple judicial procedure," T.C.A. § 37–201; afford numerous alternatives to

---

1. Although the majority opinion deals only with delinquency charges, the dissent in *Perry v. Banks*, 521 S.W.2d 549 (Tenn.1975), alluded to by the majority, was not so limited. If the major premise of the majority opinion is valid, it seems to us inevitable that no lay judge could

ever preside over any type of hearing involving deprivation of liberty, including General Sessions judges and judges of municipal or other courts having statutory jurisdiction to impose jail or prison terms.

judges in the disposition of delinquent, unruly, dependent and neglected, and abandoned children; and expressly provide that any disposition or adjudication in the juvenile court

"is not a conviction of crime and does not impose any civil disability ordinarily resulting from a conviction or operate to disqualify the child in any civil service application or appointment." T.C.A. § 37–233.

It is true that in numerous cases proceedings in the juvenile courts have been analogized to criminal cases, and many constitutional safeguards and protections incident to regular adult criminal proceedings have been held applicable to cases in juvenile courts. Further, the system has received considerable criticism, and there is support for abandoning the "two-track" system of juvenile and criminal courts, and returning juvenile offenders, particularly in the more serious cases, to the regular criminal justice system. *See e. g.,* comments by Sen. Edward M. Kennedy in a recent article *"Juvenile Criminals are Getting Away with Murder,"* The Judges' Journal, Vol. 17, No. 4, p. 4 (1978).

In our opinion, however, it is not for the courts to determine whether or not the juvenile justice system has failed in its intended purpose. That is a decision for the legislature and for the voting public. Certainly there is no evidence in the present record to justify any such conclusion. It is our apprehension that the "advancing standard" so ardently advocated by the majority will, without sufficient documentation, deal a serious blow to the administration of the juvenile justice system and will "advance" the treatment of juvenile offenders directly back into the eighteenth century, where they were tried and dealt with as common criminals. Perhaps this is as it should be, but there are no convincing data to that effect in the present record, nor, in our opinion, is there anything in either the state or the federal constitutional due process provisions requiring any such result.

The state already has a system of regular criminal courts, presided over by lawyer judges. In our view, the effect of the present decision will simply cause lay juvenile judges to transfer most delinquency petitions to the criminal courts for disposition. Possibly the ramifications of the opinion may be such as to require that result in all delinquency petitions. As we understand the majority opinion, even though a lay juvenile judge is constitutionally disqualified from performing an important segment of the duties assigned by statute to his office, he nevertheless may continue to hold the office and perform a number of other duties. He simply may not try delinquency petitions. To say the least, this is an unusual proposition. Ordinarily when an individual lacks the qualifications for an office required by the constitution, he simply may not hold that office and must be removed and replaced by a competent individual. *See Waters v. Ogle,* 583 S.W.2d 756 (Tenn.1979).

Nevertheless, as we understand the majority opinion, lay judges presently exercising juvenile jurisdiction may continue to function except in delinquency cases. From a constitutional standpoint, therefore, it must follow that the juvenile justice statutes as presently written, insofar as they authorize the trial of a delinquency charge before a lay person, are unconstitutional for lack of due process. The result of that conclusion, therefore, is that they probably cannot be enforced in counties having lay persons as juvenile judges. Minority, however, is not and never has been a defense to most criminal charges. Juveniles are not immune from the criminal law. In counties having lay judges, therefore, juvenile offenders may have to be processed and tried through courts which do afford due process, that is, the regular criminal courts, while in counties having lawyer judges, the juvenile offenders may continue to be accorded the more lenient treatment and options available under the juvenile justice system. This, in our opinion, presents an equal protection problem of enormous proportions, possibly rendering the entire system unconstitutional and requiring all charges of delinquency to be tried and disposed of in the regular

criminal justice system. To use a vernacular consonant with the majority opinion, this would seem to be throwing out the baby with the bath water and is, assuredly, not the result intended by the majority. To say the very least, however, the ramifications and effects of the majority opinion may be far-reaching and, in our opinion, have been given insufficient analysis. This Court does not have the authority to create other courts or judgeships or to "transfer" jurisdiction from one court to another. Without intending to do so, in our opinion, the majority may have effectively terminated the present juvenile system of the state insofar as charges of delinquency are concerned, thereby depriving youthful offenders of the many options, lenient treatment and de novo appeal which the General Assembly intended to afford them as a matter of public policy.

Further, we find no warrant for the conclusion stated by the Court of Appeals, Middle Section, in its opinion in *State v. Williams*, referred to in the majority opinion, that there is "a reasonable likelihood or probability of prejudice" when lay judges "preside over juvenile proceedings that result in incarceration." Juvenile judges have authority to determine many other questions as far reaching as temporary incarceration, such as permanent custody, and there is simply no basis in the record nor any empirical data, insofar as we are aware, to indicate that such judges would be more likely to show "prejudice" in one type of case as against another.

Equally unsupported is the assertion in the majority opinion that hundreds or thousands of Tennessee children have been "deprived of their liberty by judges who had no expertise or training in the law."

The juvenile judge who heard and disposed of the present case had nineteen years of judicial service. He had three years of training in a law school whose graduates are accredited by this Court to take the Tennessee Bar Examination. Only as an afterthought—indeed after trial of the habeas corpus case on its merits—was the matter of the judge's qualifications even made an issue in the case. The testimony at the habeas corpus hearing was highly conflicting and disputed, but at the conclusion thereof an experienced chancellor, from the bench in an oral opinion, held that no error had been committed and that there had been free, voluntary and conscious pleas of guilty and waiver of right to counsel. The Court of Appeals concurred in these findings.

According to an appendix to the State's brief in this Court, there were twenty counties in the state, as of August 13, 1976, having fewer than seven lawyers, one of them having none at all. All but thirty-one of the juvenile judges in the state received a salary of less than fifteen thousand dollars according to a statistical study made in 1974. From these data, it seems apparent to us that there may be serious problems in attracting attorneys to seek or hold the office of juvenile judge, particularly in those counties where the juvenile judge is also the county judge and has numerous other duties. We are in full agreement that, as a matter of state constitutional law, the General Assembly may impose requirements for judges in addition to those set out in Article 6, and that it may require judges to be lawyers when that is deemed necessary. The absence of such a requirement, however, particularly in rural areas, is entirely understandable and is consistent with the political, constitutional and judicial history of the state.

We do not disagree with the statements made in the majority opinion that due process is not a fixed or rigid standard, and that there must be room for expansion in constitutional interpretation to meet evolving needs and problems. Constitutions, however, are the basic framework of government in American political theory. While designed to be elastic and to permit expansion, they are nevertheless, like most foundations, permanent in nature, subject to revision and amendment only by prescribed methods. They are more like concrete and steel in the foundation of a building than mere putty or soft plastic. The ideal of a rule of law, rather than of men, while never

completely attainable, is reflected in the existence of written constitutions, the interpretation and construction of which are not supposed to change with personnel, on a court or in any other branch of government, but are designed to afford stability and permanence.

We would not be opposed to a statutory provision by the General Assembly that judges be licensed lawyers. We certainly would not oppose a specific amendment to the state constitution to that effect. We are unalterably opposed, however, to interpreting the constitution, particularly upon an inadequate and undocumented record, to achieve ends which might otherwise and superficially seem desirable to the then current majority of a court of last resort.

If the rights of either of the two juveniles whose cases are involved here have in any way been impinged upon by the procedures followed at their hearing in April 1976, there are and have always been ample statutory procedures available for the correction of such errors. To hold that the judge who tried them, however, is constitutionally disqualified from hearing the case is quite another matter and is a departure from precedent and principle in which we cannot concur.

As previously stated, there can be no doubt that the majority opinion is well-intended and that its purpose is to make meaningful the right to counsel constitutionally guaranteed to youthful offenders, including the right to be represented at the hearing of a juvenile delinquency charge and to be advised of the broad appeal and right to a re-trial afforded in the statutory system, including a jury trial if desired. In our view, these desirable ends could be achieved very simply and with a much less drastic effect upon the juvenile justice system by requiring that in every case in which a juvenile is charged with violation of the criminal law and with being a delinquent, he must be afforded counsel and that there can be no waiver of that right.

It would be a simple matter to reverse this case and to require a re-trial with proper representation of the accused, including advice to them of their right to appeal if found guilty. The law in this state does not and, to our knowledge, never has permitted final judgment to be rendered against minors in civil litigation without assurance that their interests are safeguarded by a guardian ad litem, general guardian or other representative. It would seem that persons charged with delinquency are entitled to at least the same rights, and that parents, custodians or others should not be permitted to waive a juvenile's right to counsel. Such a holding, in our opinion, would preserve intact the juvenile justice system and would also preserve the public policy announced by the legislature therein.

For these reasons we respectfully dissent from the majority opinion.

## OPINION ON PETITION TO REHEAR

HENRY, Justice.

Responsive to the Respondent's petition to rehear, we hold that this opinion shall not be retroactive. It will apply to all cases tried on or after its release and to all cases in process of appellate review wherein the specific issue is raised.

We take this occasion to clarify and to emphasize the extent of our holding.

At the outset we defined the issue to be "whether *an adjudication of delinquency* and a commitment to the Department of Corrections by a nonlawyer judge violates Article I, Section 8 of the Constitution of Tennessee."

We noted that a child is delinquent when he "has committed any act designated a crime, Section 37–202(3)."

■ Thus, the opinion does not cover proceedings involving unruly, dependent, neglected or abandoned children. It does not cover shelter care, protective supervision or home placement, or other similar custody involving the control or physical care of the child with the goal of providing for the physical, mental, moral and emotional wellbeing of the child. *See* Section 37–202, T.C.A.

It is important to note that Section 37–226, T.C.A., relating to the right to counsel and Section 37–227, T.C.A., governing the basic rights of juveniles, are applicable only to delinquency hearings.

We emphasized throughout the opinion that we were dealing only with delinquent children—those charged with the commission of criminal offenses, where a conviction would result in confinement or a deprivation of liberty, a result which is attendant only upon a finding of delinquency as defined in the statutes. We reiterate that the custody arrangements made in cases involving dependent, neglected, abandoned or unruly children, does not constitute confinement or deprivation of liberty. The litmus test must be a finding of guilt of delinquency and punishment as contemplated by Section 37–231, T.C.A., subdivisions (3) and (4).

Further, nothing in the holding of this Court precludes a nonlawyer judge from making a pre-trial inquiry designed to determine whether there is substantial likelihood that a hearing, if conducted, would result in an adjudication of delinquency and confinement.

All members of the Court adhere to their original views.