# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### October 18, 2000 Session

# IN THE MATTER OF OLIVER RAY VALENTINE, JR., D.O.B.: 3/23/94, A CHILD UNDER THE AGE OF 18 YEARS

**An Appeal from the Juvenile Court for Shelby County**
**No. G9269      George E. Blancett, Special Judge**

---

### No. W1999-01293-COA-R3-CV - Filed March 19, 2001

---

This is a termination of parental rights case. A twenty-one month old boy was removed from his parents' home after the mother beat him with a belt, leaving bruises on his back, chest, head, and face. Three and a half years later, after the parents had failed to satisfy the conditions in the son's plan of care, the Department of Children's Services filed a petition to terminate their parental rights. The Juvenile Court for Shelby County terminated the mother's and father's parental rights. The mother and father appeal, arguing that the Tennessee Constitution prohibits a non-attorney, elected juvenile court judge from appointing a special judge, who is an attorney but not elected, to hear a termination of parental rights case. They also argue that there is not clear and convincing evidence to support the termination of their parental rights. We affirm, finding that the Tennessee Constitution does not prevent an elected, non-attorney juvenile court judge from appointing a juvenile court referee, who is an attorney but not elected, to hear cases involving the termination of parental rights, and that there is clear and convincing evidence to support the termination of parental rights in this case.

### Tenn.R.App.P. 3; Judgment of the Juvenile Court Affirmed.

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Debra N. Brittenum, Webb A. Brewer, and Nancy P. Kessler, Memphis, for the appellants, Chanya Wallace Valentine and Oliver Ray Valentine, Sr.

Paul G. Summers, Attorney General and Reporter, and Douglas Earl Dimond, Assistant Attorney General, Nashville, for the appellee, Tennessee Department of Children's Services

**OPINION**

This case involves the termination of parental rights. Oliver Ray Valentine, Jr. ("Oliver") was removed from the custody of Chanya Wallace ("Mother") and Oliver Ray Valentine, Sr. ("Father") on December 4, 1995. On that day, Oliver was placed in the protective custody of the Tennessee Department of Children's Services (DCS)[1] by order of the Shelby County Juvenile Court. Oliver has since resided in a foster home. Over three years later, on July 29, 1998, DCS filed a petition to terminate Mother and Father's parental rights. The Shelby County Juvenile Court, Special Judge George E. Blancett presiding, terminated the parental rights of Mother and Father, on the grounds that they had failed to comply with the requirements set out by DCS in order to regain custody, and that the conditions leading to Oliver's removal still existed and were likely to continue. Mother and Father now appeal to this Court.[2]

The hearing to terminate Mother and Father's parental rights occurred on September 9 and 13, 1999, nearly four years after Oliver was taken into protective custody. Sandra Walker, the DCS foster care manager who had handled Oliver's case since September 1996, testified at the hearing. Walker testified that Mother told DCS that she had beaten Oliver with a belt when he was one and a half years old because he had defecated in his pants. Mother told DCS that she "whipped" Oliver with a thin plastic belt while he was naked and running away from her, resulting in bruises on his back, buttocks, head, and neck. She acknowledged that she "whipped" Oliver twice a week. After the juvenile court placed custody of Oliver with DCS, the agency drafted a permanency plan[3] for Oliver. Mother and Father were informed of their responsibilities under the plan on January 8, 1996.

---

[1]The Tennessee Department of Children's Services, or DCS, was established in 1996 in an effort to consolidate all the services provided to children by multiple state departments, including those provided by the Department of Human Services (DHS). 1996 Tenn. Pub. Acts Ch. 1079, § 3. For the purposes of this opinion, the term DCS will be used, even though Oliver's case was handled by DHS prior to 1996.

[2]There is some discrepancy in the record as to whether Mother *and* Father are jointly appealing the termination of their parental rights, or whether Mother alone appeals the termination of her rights. The Notice of Appeal filed on November 15, 1999, indicates that Mother is the only party appealing the juvenile court's order. However, the notice of the filing of the transcript filed on March 10, 2000, begins with the phrase, "[t]he appellants, Chanya Wallace Valentine and Oliver Ray Valentine, Sr., . . ." Also, the brief filed by the appellant[s] seeks the reinstatement of both Mother and Father's parental rights. In this appeal, we will consider the parental rights of both Mother and Father.

[3]Under Tenn. Code Ann. § 37-2-403(a)(Supp. 2000), DCS must prepare a "permanency plan" for every child within thirty days of foster care placement. The permanency plan is supposed to specify a goal for each child's placement, whether it be return to parent, placement with a relative, adoption, permanent foster care, or emancipation. Walker testified that DCS formerly referred to these as plans of care, but now they are called "permanency plans." We will refer to them as permanency plans.

Under the first plan, Father was to complete parenting classes, pay child support, and participate in scheduled visitation. Walker said that Father never attempted to comply with these requirements. Walker testified that, under the first plan, Mother had a separate set of responsibilities. She had to attend parenting classes, participate in a vocational class or obtain a GED, obtain stable housing, and maintain a supervised visitation schedule with Oliver. Walker testified that Mother did not comply with those requirements by DCS's target date.[4]

In December 1996, DCS drafted a second plan of care for Mother and Father, in order to give them additional time to comply. The second permanency plan had the same requirements as the first one, and Mother and Father did not complete the requirements by the respective target dates. Walker testified that the agency drafted a third permanency plan for Mother in July 1997. At that point, Walker stated, Mother attended and completed parenting classes, but was referred to a second parenting program because the organization that administered the parenting classes, the Exchange Club, believed that Mother had not comprehended the material in the parenting class. A letter from the Exchange Club states that Mother scored substantially similar scores on the pre-class and post-class tests that she took, showing a lack of retention of the information in the class.

In June 1998, the agency drafted a fourth permanency plan. This plan had a target date of July 1999. In addition to the conditions under the prior permanency plans, the plan required Mother to attend individual counseling and undergo a neuropsychiatric evaluation. The individual counseling was intended to help Mother learn how to better cope with the stresses of parenting, learn more about child development and the care that a child requires, and to help her deal with the domestic abuse inflicted by Father. Walker stated that the counseling and psychiatric evaluation should have been a part of the first permanency plan, based upon the recommendation of an independent agency, but through oversight such requirements were omitted from the earlier plans.

Walker testified that, although Mother attended some of the parenting classes, she did not complete the classes under the fourth plan of care. She testified that Mother had not complied with other requirements of the plan, in that she had not obtained her GED, and had not obtained stable, long-term housing. Between October 1996 and June 1998, Mother reported seven different addresses to DCS. Walker testified that Mother visited Oliver, but that her visitation was irregular and inconsistent. Under DCS arrangements, Oliver would be brought to the home of his maternal grandmother, Erma Patterson ("Patterson"), and Mother would go there to visit him. During the four months prior to the filing of the petition to terminate Mother and Father's parental rights on July 29, 1998, Mother did not visit Oliver. Patterson had temporarily moved to Chicago and Mother did not ask to visit with Oliver during this time. Walker testified that Mother did not attend individual counseling, as required under the plan of care, nor did she undergo a neuropsychiatric evaluation. Walker stated that Mother has another child, a daughter named Alexis, who was eight years old.

_____

[4]Walker stated in her testimony that DCS usually gives parents six months to comply with their requirements under the permanency plan. It is unclear from the record why, under the first permanency plan, Mother was given only three months to comply with the conditions, while Father was given a full six months.

Unlike Oliver, who was placed in a foster home, Alexis was placed with her grandmother, Patterson, and DCS has not filed a petition to terminate Mother's parental rights to Alexis. Walker said that Mother's refusal to change her behavior was reflected in her "constant, consistent moves, constantly moving, never being stabilized or settled, knowingly and admittedly having a chaotic, argumentative, fighting relationship with Mr. Valentine who was not her husband at that time." Neither Mother nor Father contributed monetarily to Oliver's support during the nearly four years he had been in foster care.

Dr. Manuel Morada, a psychiatrist, testified on behalf of DCS. Mother was referred to Dr. Morada by DCS, and he met with Mother twice in August 1998. On his initial evaluation, Dr. Morada noted that Mother told him she was seven weeks pregnant. She told him that she had a history of mood swings, crying spells, and hypersomnia.[5] She also told him that she suffered from decreased appetite and passive suicidal thoughts. In 1994, she was hospitalized after attempting to overdose on her mother's medications on two separate occasions. Dr. Morada noted that, at the time he saw Mother, she did not exhibit signs of depression. Dr. Morada said that he encouraged Mother to attend weekly counseling sessions, but that she attended only one session. He testified that Mother has a low intelligence level, with limited insight and poor judgment. She was described as "mentally retarded mild" with "borderline intellectual functioning."

The trial judge also heard testimony from Suzanne Guest, a Community Services Assistant with DCS, who transported Oliver to his family visitations at Patterson's home and supervised those visits when Patterson was not present. Guest testified about the visits between Mother and Oliver. She testified that, overall, the visits were good. However, when Oliver was first taken into DCS custody, Mother attended only about twenty-five percent of the visits at Patterson's house. Guest testified about an incident in which she took Oliver to visit with both Father and Mother, but Father would not permit Mother to visit with Oliver, asserting that Mother had to go and pay the Memphis Housing Authority. Guest noted that Oliver was always happy to visit with Mother.

Mother testified at the hearing. She said that she did not attend classes for her GED because she needed to work instead. She testified about her current job, demonstrating products at various department stores. She said that her pregnancy in 1998, at the time she saw Dr. Morada, ended in a miscarriage. Mother acknowledged that she was again pregnant at the time of the hearing in September 1999, and that the baby was due in January 2000. She testified that she and Father were married April 9, 1999. She conceded that, despite her efforts, Father was not involved in Oliver's life. As to her many addresses from 1996 to 1998, she said that while her husband was incarcerated, she was afraid of living alone, and she often moved in with other family members. She acknowledged that some of her frequent moves were because of Father's physical abuse. She testified that she did not attend the weekly counseling sessions with Dr. Morada, as he recommended, because Dr. Morada's office told her that they did not perform neuropsychiatric exams and she was already attending counseling at a case management center. She felt that she did not need to go back to Dr. Morada for counseling. With regard to the incident in which she brutally

---

[5]Hypersomnia is a condition where a person sleeps more than normal.

beat Oliver with the belt, Mother acknowledged, "I made a big mistake, and I learned a valuable lesson about whooping my child. And in the parenting classes I learned a whole lot about time out." She admitted that since Oliver had been in protective custody, she had been arrested in Mississippi for disorderly conduct. She also admitted that she and Father had a "stormy relationship," and conceded that physical violence had been a pattern in her relationship with Father. She acknowledged that Father had physically abused her as recently as January 1999, less than three months before their marriage and eight months prior to the hearing. Mother's sister, Nicole Patterson, testified at the hearing that Father continues to physically abuse Mother.[6]

Father also testified at the hearing. He testified that he has nine children, including Oliver, and that he didn't "just really know where all of them are right now." He acknowledged that he never attempted to comply with DCS permanency plans, asserting that it was because DCS never contacted him and told him what he was required to do. He said "They wasn't dealing with me, period. . . . They wasn't contacting me. They wasn't saying Oliver, Sr. you need to do this and do that. My wife always was the one that had to do everything." Father acknowledged never paying any child support for Oliver, but contended that he was never ordered to pay child support. Father admitted hitting Mother in the past, asserting that it was simply because he was "human" and made "mistakes." He said that he had not hit Mother "since January" preceding the hearing. When he and Mother quarrel, Father said he would "go outside" and come back in when she went to bed.

Patterson, Oliver's maternal grandmother, acknowledged in her testimony that she has legal custody of Alexis, Mother's older child. Patterson said that Mother comes to see Alexis "almost every day" and babysits her nieces and nephews. When asked about Father, Patterson said that she had "never seen him whip nobody, no." Patterson acknowledged that Oliver was taken away from his parents because he "had a lot of bruises" and "got whooped real bad," but said that she didn't know whether Mother inflicted those injuries.

After hearing the testimony, Special Judge Blancett issued an oral ruling. The trial court first commented on Mother's "lack of substantial compliance" with the DCS permanency plans and Father's "nearly . . . total lack of compliance. . . ." He described Mother's efforts to adjust her life to regain Oliver as "perfunctory," observing that visiting Oliver was frequently "secondary" and noting her "on-again-off-again efforts to develop and hone skills necessary for the raising of a small child. . . ." He noted that Patterson, the maternal grandmother, would say only that Mother was now

_____

[6]The following exchange occurred between Yolander Hardaway, the Court Appointed Special Advocate, and Nicole Patterson:

Q:  Would you be concerned now that she still lives with Mr. Valentine, who still beats and hits her at least by her own admission?
A:  Am I concerned? Yes, he still whip her.
Q:  You don't appear concerned about that? I'm asking if you're concerned about that?
A:  No.

babysitting, but did not assert that Mother should regain custody of either her children, both out of Mother's custody approximately four years.

The trial court commented on the fact that neither Mother nor Father had contributed to Oliver's financial support since he had been in foster care. The trial judge expressed particular concern about Mother's continuing relationship with Father, noting the "evidence of some continuing abuse on his part up to . . . January of this year," with no insight into whether Father's physical abuse of Mother contributed to Mother's abuse of Oliver. The trial judge observed that Father testified that he physically abused Mother at times simply because he is "just human" and "makes mistakes." The trial judge noted that Father did not testify that he "had gotten things under control," testifying only that "I go outside now. . . ." The trial court said that "there is not much confidence that the Court can place on that kind of reaction to abuse that has been a track for nearly five years." The trial court described Mother's continuing relationship with Father as a "deciding factor," indicating that it "diminishes the child's chances of an early integration into a safe and permanent home."

On October 14, 1999, Special Judge Blancett issued an order terminating Mother's and Father's parental rights. In the order, he found that both Father and Mother failed to attend parenting classes, that neither Mother nor Father contributed to Oliver's support, that Father failed to participate in scheduled visitation with Oliver, that Mother failed to participate in vocational classes or obtain her GED, and that Mother failed to obtain stable housing. The order stated that Mother's "continued living in an abusive relationship is a factor that demonstrates to the Court that the child will not have early integration into a stable home." The judge concluded as a matter of law that Mother and Father had failed to comply with the conditions set out in Oliver's permanency plans, and that the conditions which led to Oliver's removal from their home still existed and were likely to continue. From this order, Mother and Father now appeal.

Four issues are raised in this appeal. Mother and Father argue first that the termination of their parental rights should be reversed because Article I, § 8 of the Tennessee Constitution, commonly referred to as the "law of the land" clause, prohibits a non-attorney judge from presiding over a hearing involving the termination of parental rights. Secondly, they argue that Article VI, § 4 of the Tennessee Constitution, which refers to the election of judges, requires that an elected judge preside over a case involving the termination of parental rights. Third, they contend that Tennessee Code Annotated § 17-2-118(f)(2), which allows a judge to appoint a judicial officer who is a licensed attorney as a special judge to hear matters related to his or her duties as a judicial officer, contravenes Article VI, § 4 of the Tennessee Constitution. Next, Mother and Father argue that there is not clear and convincing evidence of grounds to terminate their parental rights. Mother and Father also contend that the termination of their parental rights violated their equal protection rights under both the federal and state constitutions. The issues regarding equal protection were not raised to the trial court; consequently, these issues are precluded because they are raised for the first time on appeal. *See Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983).

The rights of parents in the care, custody, and control of their children are fundamental. *See Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994). Those rights are not absolute, however, and may be terminated in certain limited circumstances. *See In re Swanson*, 2 S.W.3d 180, 187 (Tenn. 1999). The termination of parental rights must be based on (1) a finding by the court based on clear and convincing evidence that one or more statutory grounds exists justifying the termination of parental rights, and (2) a finding that termination of parental rights would be in the child's best interest. *See* Tenn. Code Ann. § 36-1-113(c); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

On appeal, it is undisputed that the elected judge of the Shelby County Juvenile Court, Judge Kenneth A. Turner, is not a licensed attorney. It is also undisputed that the person appointed to hear this case, Special Judge George E. Blancett, is a licensed attorney who serves as a juvenile court referee in the Shelby County Juvenile Court. Special Judge Blancett is not elected. The record does not indicate how Special Judge Blancett was appointed to hear this case, but Judge Turner was authorized to appoint him under Tennessee Code Annotated § 17-2-118(f)(2).[7]

The parties agree that, under Article I, § 8 of the Tennessee Constitution, a proceeding to terminate parental rights must be heard by a judge who is a licensed attorney. Article I, § 8 is commonly referred to as the "law of the land" clause. It reads: "That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land." The "law of the land" clause provides citizens in Tennessee courts the same

---

[7]Tennessee Code Annotated § 17-2-118 (Supp. 2000) reads:

**Substitute Judges.** – (a) If, for good cause, including, but not limited to, by reason of illness, physical incapacitation, vacation or absence from the city or judicial district on a matter related to the judge's judicial office, the judge of a state or county trial court of record is unable to hold court, such judge shall appoint a substitute judge to hold court, preside and adjudicate.
(b) A substitute judge shall possess all of the qualifications of a judge of the court in which the substitute is appointed.
* * *
(f) The provisions of subsections (a)-(e) shall not apply where a judge finds it necessary to be absent from holding court, and appoints as a substitute judge:
(1) A duly elected or appointed judge of any inferior court; or
(2) A full time officer of the judicial system under the judge's supervision whose duty it is to perform judicial functions, such as a juvenile referee, a child support referee or clerk and master, who is a licensed attorney in good standing with the Tennessee supreme court. Such judicial officer shall only serve as special judge in matters related to that officer's duties as a judicial officer.
Notwithstanding the provisions of subsections (a)-(e), a judge shall have the authority to appoint a substitute judge as provided in this subsection.

protections provided by the due process clauses of the federal constitution. ***See State ex rel. Anglin v. Mitchell***, 596 S.W.2d 779, 786 (Tenn. 1980). In ***Anglin***, the Tennessee Supreme Court held that Article I, § 8 requires that a judge presiding over a juvenile delinquency matter be a licensed attorney if the minor faces possible incarceration. ***See id.*** at 791. In matters involving the possible loss of liberty, the ***Anglin*** court reasoned that such proceedings were "no place for an untrained judge." ***Id.*** at 788. Mother and Father note that Rule 39(f)(2) of the Tennessee Rules of Juvenile Procedure allows the appointment of an attorney to represent an indigent parent in a termination hearing,[8] and that this Court recently that held that the provisions of Rule 39(f)(2) are mandatory. ***See In re Valle***, No. W1998-00617-COA-R3-CV, 2000 WL 286710, at \*6 (Tenn. Ct. App. Feb. 17, 2000) (citing ***State v. Taylor***, No. 03A01-9609-JV-00286, 1997 WL 122242, at \*2 (Tenn. Ct. App. March 19, 1997). Mother and Father also cite Rule 13(1)(d)(7) of the Rules of the Tennessee Supreme Court, which provides for the appointment of counsel to represent indigent parents in termination proceedings.

Mother and Father argue on appeal that the termination of their parental rights should be reversed because such proceedings must be heard by a judge who is an attorney. However, it is undisputed that Special Judge Blancett is a licensed attorney. Therefore, Mother and Father cannot assert that they have been denied due process on this basis.

Appellants' second contention on appeal is that the termination of their parental rights should be reversed because Article VI, § 4 requires that an elected judge preside over a proceeding to terminate parental rights. Article VI, § 4 reads: "The Judges of the Circuit and Chancery Courts, and of other inferior Courts, shall be elected by the qualified voters of the district or circuit to which they are to be assigned. . . ." It is undisputed that Special Judge Blancett, though an attorney and a juvenile court referee, is not an elected judge. Therefore, the issue is whether a non-attorney, elected judge can appoint a special judge, who is an attorney but not elected, to hear a termination of parental rights case and meet the respective mandates of Article I, § 8, and Article VI, § 4 of the Tennessee Constitution.

There is no constitutional requirement in Tennessee that judges be licensed to practice law. The only requirements for judges under the Tennessee Constitution are that they be elected, be at least thirty years old, and have been a resident of the state for at least five years and a resident of the district in which they will serve for at least one year. ***See*** Tenn. Const. art. VI, § 4. In ***LaFever v. Ware***, 365 S.W.2d 44, 51 (Tenn. 1963), the Tennessee Supreme Court held that the Legislature has the power to add qualifications for judges in addition to the requirements in the Tennessee Constitution. Pursuant to this, the General Assembly enacted a law requiring that all judges be licensed attorneys.

---

[8]Tennessee Rule of Juvenile Procedure 39(f)(2) reads:

At the beginning of the hearing, any party who appears without an attorney shall be informed of the right to an attorney, and in the case of an indigent respondent, the court shall consider the facts and circumstances alleged and make a determination as to whether an attorney should be appointed.

*See* Tenn. Code Ann. § 17-1-106. Under Tennessee Code Annotated § 17-1-106(b)(2), this requirement does not apply to the Shelby County juvenile court judge.

As noted above, Tennessee Code Annotated § 17-2-118(f)(2) allows for the appointment of judicial officers as special judges. Section 17-2-118 was enacted by the Legislature under the powers granted in Article VI, § 11 of the Tennessee Constitution, which states that "[t]he Legislature may by general laws make provision that special Judges may be appointed, to hold any Courts the Judge of which shall be unable or fail to attend or sit; or to hear any cause in which the Judge may be incompetent." In interpreting the Tennessee Constitution, effect must be given to its terms in light of the whole document. *See State ex rel. Witcher v. Bilbrey*, 878 S.W.2d 567, 575 (Tenn. Ct. App. 1994). The requirement set out in Article VI, § 4 that judges be elected does not contradict the Legislature's express authority to make laws providing for the appointment of special judges under Article VI, § 11. *See id.*

Appellants argue that §17-2-118(f)(2), when read in conjunction with §17-2-109(c),[9] is unconstitutional under Article VI, § 4 because it allows judges who are not elected to routinely hear cases involving fundamental rights. As noted above, § 17-2-118(f)(2) states that, where necessary, a judge may appoint as a special judge a juvenile court referee who is a licensed attorney, without obtaining the consent of the parties or following the other provisions for appointing a special judge. *See* Tenn. Code Ann. § 17-1-118(f)(2). Appellants contend that their constitutional right to due process is violated by the consistent adjudication of fundamental rights by a judge who is not elected.[10]

In *Witcher*, a special judge was appointed by the Governor to sit for a general sessions judge who was disabled. *Witcher*, 878 S.W.2d at 569. The Court of Appeals considered, *inter alia*, whether the statute under which the special judge was appointed infringed "on the public's constitutional right to elect their judges . . . ," under Article VI, § 4 of the Tennessee Constitution. *Id.* at 573. The *Witcher* Court noted that the "purpose of Tenn. Const. art. IV, § 4 is to identify the persons who should elect Tennessee's judges." *See id.* at 575. It stated that the constitutional provision was not intended to prevent the appointment of special judges. *Id.* It concluded that the

---

[9]Tennessee Code Annotated § 17-2-109 gives the chief justice of the supreme court the power to appoint special judges to alleviate congested court dockets in certain circumstances. While Appellants do not question the constitutionality of §§ 17-2-109(a) and 17-2-109(b), they raise an issue regarding the constitutionality of §17-2-109(c), which reads: "Nothing herein shall be construed to interfere with the appointment of special chancellors or judges as provided elsewhere by statute."

[10]Appellants appear to assume that this Court will take judicial notice that the juvenile court judge in Shelby County routinely appoints juvenile court referees as special judges to hear cases involving the termination of parental rights. The record indicates that this was done in this case, but does not reflect a general practice. For purposes of this appeal we will assume *arguendo* such a practice, but we do not take judicial notice of such a fact.

statute providing for the appointment of special judges did not "run afoul of Tenn. Const. art. 6, § 4." *Id.*

Appellants argue that *Witcher* is inapplicable because it involves a statutory mechanism for the temporary replacement of a disabled judge, rather than a standing practice of appointing a special judge for a certain class of cases. The issue of a standing practice of appointing a special judge for certain types of cases was referred to *Ferrell v. Cigna Prop. & Cas. Ins. Co.*, 33 S.W.3d 731 (Tenn. 2000). In *Ferrell*, the trial judge issued a standing order designating the Clerk and Master as a special judge to hear all worker's compensation cases in that judicial district. *Ferrell*, 33 S.W.3d at 736. The Tennessee Supreme Court noted in *Ferrell* that Tennessee Code Annotated §§ 17-2-118 and 17-2-122 authorized the appointment of a clerk and master or a juvenile court referee as a special judge. *See id.* at 736-737. The Court emphasized that such an appointment should be made only when the judge's absence is "necessary," and should be "either for a definite period of time or for a specific case." *Id.* at 737, 739. While it termed the standing order as "inappropriate," the Court stated that such a "procedural error does not require reversal." *Id.* at 739. The *Ferrell* Court noted that even an "unconstitutional statute is sufficient to give . . . authority to . . . appoint a judicial officer," and that the acts of such a judge would be binding on the parties before the judge. *Id.* (quoting *State ex. rel. Newsom v. Biggers*, 911 S.W.2d 715, 718 (Tenn. 1995)). Therefore, the *Ferrell* Court affirmed the trial court's decision. *See id.*

Moreover, other Tennessee courts have recognized that due process is not offended when a juvenile court referee who is not elected decides a case involving fundamental rights. *See State v. York*, 615 S.W.2d 154, 156 (Tenn. 1981) (stating in dicta that a revocation of a juvenile's parole by a lawyer referee who was not an elected official satisfied *Anglin*); *Hill v. Turner*, 1987 WL 6371, at *2 (Tenn. Ct. App. Feb. 13, 1987) (holding that the adoption of a lawyer referee's findings by an elected, non-lawyer judge in a case involving the incarceration of a person for failure to pay child support did not violate *Anglin*). Therefore, assuming *arguendo* that the appointment of Special Judge Blancett was pursuant to a standing order appointing juvenile court referees to hear cases involving the termination of parental rights, we hold that Article VI, § 4 of the Tennessee Constitution does not confer on the Appellants an absolute right to have their case heard by an elected judge, and that any procedural infirmity alleged by the Appellants in this case does not require reversal of the trial court's decision.

The only remaining issue is whether the termination of Mother and Father's parental rights was supported by clear and convincing evidence. The juvenile court terminated Mother and Father's parental rights on the grounds that they failed to comply with their responsibilities in the permanency plans developed by DCS, and that the conditions leading to Oliver's removal still existed and were likely to continue. *See* Tenn Code Ann. §§ 36-1-113(g)(2) and 36-1-113(g)(3)(A)(i). These statutory grounds must be supported by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re M.W.A., Jr.*, 980 S.W.2d at 622. "Clear and convincing evidence" has been described as that "in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901, n.3 (Tenn. 1992).

It is essentially undisputed that Father failed to comply with his requirements under the permanency plans developed by DCS. It is apparent from Father's testimony that he took no interest in regaining custody of Oliver. He admitted that he had never attempted to comply with any of the permanency plans, saying that "[t]hey wasn't dealing with me, period." Father felt that Mother was the only person who was supposed to work with DCS to regain custody of Oliver. Moreover, from the record, it is clear that Father had repeatedly physically abused Mother and had taken no steps to control this pattern of behavior. Neither parent contributed monetarily to Oliver's support during the nearly four years he had been in foster care. While Mother made inconsistent efforts to comply with the DCS permanency plans, she failed to obtain her GED or vocational training, and did not obtain the extra counseling required under the plans. Most importantly, Mother maintained her relationship with Father, indeed married him, and seemed unable to understand the impact of Father's behavior on Oliver's home environment. Under these circumstances, we conclude that there is clear and convincing evidence to support the termination of the parental rights of both Mother and Father.

The decision of the juvenile court is affirmed. Costs are taxed to the appellants, Chanya Wallace Valentine and Oliver Ray Valentine, Sr., and their surety, for which execution may issue if necessary.

_____
HOLLY KIRBY LILLARD, JUDGE